IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNA ACKAWAY, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 14-1300 |
| | : | |
| v. | : | |
| | : | |
| AETNA LIFE INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

Smith, J.                                      September 30, 2016

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, provides protections for employees participating in their employers' benefits plans. Due to complaints of migraine headaches and other symptoms, the plaintiff sought short-term disability benefits through her employer. The defendant, as the employer's claims administrator, reviewed and denied the plaintiff's application. The plaintiff contends that the defendant ignored her treating physicians' medical records and based this denial on a "cold and cursory" review by an independent physician. The defendant argues that it considered her subjective reports of pain and related symptoms, but found that the plaintiff failed to supply it with objective medical findings to support the extent or severity of her reported symptoms so as to render her disabled.

After the defendant denied the plaintiff's short-term disability claim, the plaintiff commenced the instant action. During the course of this case, the plaintiff continued to experience medical issues and eventually applied for long-term disability benefits under her employer's long-term disability plan. Once again, the defendant, acting as the claims administrator, reviewed and denied the application for essentially the same deficiencies noted in

the denial of short-term disability benefits.  The plaintiff then amended her complaint to add a claim for the purported wrongful denial of long-term disability benefits.

Currently before the court are the parties' cross-motions for summary judgment on the issue of whether the defendant wrongfully denied the plaintiff's applications for short-term and long-term disability benefits.  The parties agree that the court should review the defendant's decision using the abuse of discretion (or arbitrary and capricious) standard of review.  As explained below, the court finds that there are no genuine issues of material fact and that the defendant's decision to deny the plaintiff's request for short-term and long-term disability benefits was not without reason, unsupported by substantial evidence, or erroneous as a matter of law.  Accordingly, the court will grant the motion for summary judgment filed by the defendant and deny the motion for summary judgment filed by the plaintiff.

## I.    PROCEDURAL HISTORY

The plaintiff, Anna Ackaway, commenced this ERISA action by filing a complaint against the defendant, Aetna Life Insurance Company ("Aetna"), on March 3, 2014.  Doc. No. 1. In the complaint, the plaintiff alleged that Aetna had wrongfully denied her application for short-term disability ("STD") benefits.  Compl. at ¶¶ 12-43.

Although this matter was originally assigned to the Honorable Eduardo C. Robreno, the Honorable Petrese B. Tucker reassigned this case to the undersigned on April 22, 2014.  Doc. No. 5.  Aetna filed an answer to the complaint and affirmative defenses on May 6, 2014.  Doc. No. 6.

The court held an initial pretrial conference with counsel for the parties on June 3, 2014, and issued an initial scheduling order on June 4, 2014.  Doc. Nos. 8, 9.  Due in large part to, *inter alia*, the parties' continuing settlement discussions and the plaintiff's application for long-term

disability benefits through Aetna, the court amended the scheduling order on multiple occasions to postpone the deadline for filing dispositive motions.  Doc. Nos. 11-23.  After a telephone conference with counsel for the parties on July 14, 2015, the court entered a fourth amended scheduling order.  Doc. Nos. 24, 25.  Pursuant to the fourth amended scheduling order, the plaintiff filed an amended complaint on July 28, 2015.  Doc. No. 27.  The amended complaint included claims for the alleged wrongful denial of short-term and long-term disability ("LTD") benefits.  *See generally* Am. Comp.  Aetna filed an answer with affirmative defenses to the amended complaint on August 19, 2015.  Doc. No. 28.

The plaintiff and Aetna filed motions for summary judgment on November 19, 2015, and November 20, 2015, respectively.[1]  Doc. Nos. 34, 35.  Aetna also filed the administrative record on November 20, 2015.  The plaintiff filed a response to Aetna's statement of material facts and a brief in opposition to Aetna's motion for summary judgment on December 11, 2015.  Doc. No. 38.  Aetna filed a response to the plaintiff's statement of material facts on December 11, 2015, and a brief in opposition to the plaintiff's motion for summary judgment on December 12, 2015.  Doc. No. 40.  The court held oral argument on the parties' motions on December 18, 2015.  Doc. No. 41.  The motions are ripe for disposition.

## II.    DISCUSSION

### A.    Standards of Review

### 1.    Summary Judgment Standard

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Additionally, "[s]ummary judgment is appropriate when 'the pleadings,

---

[1] Aetna also separately filed a concise statement of material facts in support of its motion for summary judgment. Doc. No. 36.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning,* 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995)).  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute").  The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production.  *Anderson,* 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for*

*M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

The court "may not weigh the evidence or make credibility determinations." *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Petruzzi's IGA Supermarkets., Inc. v. Darling–Del. Co. Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993)). Instead, "[w]hen considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (citation omitted).

The summary judgment standard is the same even when, as here, the parties have filed cross-motions for summary judgment. *Erbe v. Connecticut Gen. Life Ins. Co.*, No. CIV.A. 06-

113, 2009 WL 605836, at *1 (W.D. Pa. Mar. 9, 2009) (citing *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006)).  "When confronted with cross-motions for summary judgment . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (citing *Transguard*, 464 F. Supp. 2d at 430).

### 2.    Standard of Review for Benefit Denials Under ERISA

The plaintiff has brought this action under section 502(a)(1)(B) of ERISA, which permits a participant or beneficiary of a covered policy to bring a civil action to recover the benefits due under the terms of the policy.  29 U.S.C. § 1132(a)(1)(B).  Generally, the court must review the denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations," the court must review its decision "under an abuse-of-discretion (or arbitrary and capricious) standard."  *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citations omitted).[2]

Here, the parties agreed in their submissions and at oral argument that the court should apply the abuse of discretion (or arbitrary and capricious) standard of review.  *See* Plaintiff's Mem. of Law in Supp. of her Mot. for Summ. J. ("Pl.'s Mem.") at 10 ("It is agreed upon by the parties that the Court shall apply an 'abuse of discretion' standard'"), Doc. No. 34-1; Aetna Life Ins. Co.'s Br. in Supp. of its Mot. for Summ. J. ("Aetna Br.") at 4 ("The Arbitrary and Capricious Standard of Review governs this Court's review of Aetna's claims determinations." (emphasis omitted)), Doc. No. 35-1.  Even if they did not, it appears that the applicable STD and

---

[2] The abuse-of-discretion standard and the arbitrary and capricious standard are used "interchangeably" in ERISA cases.  *Viera*, 642 F.3d at 413.

LTD plans provide Aetna with discretionary authority to determine entitlement to benefits and construe the terms of the plan.  Thus, the court will review Aetna's decisions for an abuse of discretion.

Under this standard, "[a]n administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fleisher v. Standard Ins. Co.,* 679 F.3d 116, 121 (3d Cir. 2012) (internal quotations omitted).  "A decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision."  *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000).

The arbitrary and capricious standard of review "is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation omitted).  Although "the arbitrary and capricious standard is extremely deferential, [i]t is not ... without some teeth. Deferential review is not no review, and deference need not be abject." *Kuntz v. Aetna Inc.*, No. 10-CV-00877, 2013 WL 2147945, at *4 (E.D. Pa. May 17, 2013) (citations and internal quotation marks omitted); *see Connelly v. Reliance Standard Life Ins. Co.*, No. CIV. A. 13-5934, 2014 WL 2452217, at *4 ("Although the arbitrary and capricious standard is highly deferential, the court must still consider the quality and quantity of the medical evidence and the opinions on both sides of the issues, so as to avoid rendering courts 'nothing more than rubber stamps for any plan administrator's decision.'" (quoting *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir.2006), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

In addition,

[o]n a motion for summary judgment in an ERISA case where the plaintiff claims that benefits were improperly denied, a reviewing court is generally limited to the

facts known to the plan administrator at the time the decision was made. *Post v. Hartford Ins. Co.,* 501 F.3d 154, 168 (3d Cir. 2007), *overruled on other grounds, Doroshow,* 574 F.3d 230. "Consequently, when, as here, a plaintiff alleges that a plan administrator, such as [Aetna], abused its discretion in deciding to terminate benefits, [the Court] generally limit[s][its] review to the administrative record, that is, to the 'evidence that was before the administrator when [it] made the decision being reviewed.'" *Sivalingam v. Unum Provident Corp.,* 735 F.Supp.2d 189, 194 (E.D. Pa. 2010) (quoting *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 440 (3d Cir. 1997)); *see also Johnson v. UMWA Health & Ret. Funds,* 125 F. App'x 400, 405 (3d Cir. 2005) ("This Court has made clear that the record for arbitrary and capricious review of ERISA benefits denial is the record made before the Plan administrator, which cannot be supplemented during the litigation.").

*Plank v. Devereux Found.*, No. 13-cv-7337, 2015 WL 451096, at *6 (E.D. Pa. Feb. 2, 2015) (alterations in original).

As an additional point, the plaintiff argues that there are "procedural" conflicts of interest insofar as there were several "procedural irregularities" in Aetna's decision-making process.[3] Pl.'s Mem. at 11-14. With regard to purported conflicts of interest,

courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion.

*Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009) (citations omitted). As such, the court must "review various procedural factors underlying the administrator's decision, as well as structural concerns regarding how the particular ERISA plan was funded, to determine if the conclusion was arbitrary and capricious." *Miller v. American Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011). In this regard, "'the procedural inquiry focuses on how the administrator treated the particular claimant.'" *Id.* (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007), *abrogated on other grounds by Estate of Schwing*, 562 F.3d 522 (3d Cir.

---

[3] The plaintiff does not assert that there was a structural conflict of interest in this case. *See* Pl.'s Mem. at 12 ("It can be agreed that a structural conflict is the [sic] not at issue in the present case.").

2009)).  When reviewing "the process that the administrator used in denying benefits," courts consider "numerous 'irregularities' to determine 'whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality.'"  *Id.* (quoting *Post*, 501 F.3d at 165).[4]  "Ultimately, [the court] 'determine[s] lawfulness by taking account of several, often case-specific, factors, reaching a result by weighing all together."  *Id.* (quoting *Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).

## B.   The Applicable Record[5]

### 1.   The Disability Plans

Bank of America Corporation ("BOA") employed the plaintiff as mortgage loan officer since March 26, 2012.  Defendant's Concise Statement of Material Facts in Supp. of its Mot. for Summ. J. ("Aetna's Facts") at ¶ 1 (citing Administrative Record ("Admin. R.") at 1474, 1478, Doc. No. 37), Doc. No. 36;[6] Plaintiff Anna Ackaway's Resp. to Def.'s Statement of Facts (in Supp. of Def.'s Mot. for Summ. J.) ("Pl.'s Resp.") at ¶ 1, Doc. No. 38; Plaintiff's Mot. for

---

[4] In *Post*, the Third Circuit identified the following "illustrative, not exhaustive, list of [identified irregularities]: (1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability[.]"  501 F.3d at 165 (internal citations omitted).  Some other examples of

> [p]rocedural anomalies that call into question the fairness of the process and suggest arbitrariness include: relying on the opinions of non-treating over treating physicians without reason; failing to follow a plan's notification provisions; . . . relying on favorable parts while discarding unfavorable parts in a medical report; [and] denying benefits based on inadequate information and lax investigatory procedures.

*Morgan v. The Prudential Ins. Co. of Am.*, 755 F. Supp. 2d 639, 643 (E.D. Pa. 2010) (internal citations omitted).

[5] The court commends the parties for their compilation of the record in this matter and their legal submissions.  Nonetheless, the undersigned's policies and procedures pertaining to motions for summary judgment require a **separate** statement of undisputed material facts that should not contain legal arguments.  In addition, the responses to a party's statements of undisputed material facts should not contain legal arguments.  While it had no bearing on the ultimate outcome of the cross-motions in this case, the parties' combination of factual statements with argument rendered review of the purportedly undisputed facts and responses thereto more burdensome than necessary.

[6] The administrative record contains "AETNA" before each page number.  For ease of reference, the court has eliminated "AETNA" when citing to documents in the administrative record.

Summ. J. ("Pl.'s MSJ") at ¶¶ 2, 5, Doc. No. 34;[7] Defendant's Resp. to Pl.'s Statement of

Material Facts ("Aetna's Resp.") at ¶¶ 2, 5, Doc. No. 39.   The plaintiff described the

requirements of her job as a mortgage loan officer as follows:

> 80% Computer 20% One on One w/ Client
> Direct Contact with Past and New Clients
> Customer Service dealing with Past and Present Issues including Mortgage Crisis.
> Sales both Mortgage and Bank Products.

Pl.'s MSJ at ¶ 8; Aetna's Resp. at ¶ 8; Admin. R. at 1240.

Through the plaintiff's employment with BOA, she was eligible to participate in BOA's

Group Benefits Program, Amended and Restated Effective as of January 1, 2011 (the "Master

Plan"), which included, as component plans, the BOA Short-Term Disability Plan ("STD Plan")

and the BOA Long-Term Disability Plan ("LTD Plan").   Aetna's Facts at ¶ 2 (citing Admin. R.

at 581-697); Pl.'s Resp. at ¶ 2.[8]   BOA provided its employees, including the plaintiff, with the

BOA Employee Health and Insurance Summary Plan Description 2013 ("SPD").   Aetna's Facts

at ¶ 3 (citing Admin. R. at 385-579); Pl.'s Resp. at ¶ 3.   The SPD included chapters relating to

the STD Plan and the LTD Plan.   Aetna's Facts at ¶ 3 (citing Admin. R. at 542-557); Pl.'s Resp.

at ¶ 3.   The SPD also included a chapter on ERISA governance of BOA's benefits plans.

Aetna's Facts at ¶ 3 (citing Admin. R. at 571-579); Pl.'s Resp. at ¶ 3.

### a.   BOA's STD Plan

BOA's STD Plan was a self-funded benefit plan, which incorporated as part of its

governing documents the Master Plan and SPD, which was generally understood to be the

employee handbook and was written to supersede to replace the BOA Associates Handbook

2010.   Aetna's Facts at ¶ 4 (citing Admin. R. at 387, 594, 602, 655); Pl.'s Resp. at ¶ 4.   The STD

---

[7] The plaintiff's motion for summary judgment includes her statement of undisputed facts.
[8] The parties agree that the STD Plan and LTD Plans qualify as employee benefit plans under ERISA.  Pl.'s MSJ at ¶ 7; Aetna's Resp. at ¶ 7.

Plan defines disabled, for purposes of determining eligibility for STD benefits, as "your inability to perform your essential occupation functions, including working your regularly scheduled hours, for more than seven consecutive calendar days because of a pregnancy, illness, injury, organ donation, non-elective surgery or hospitalization." Aetna's Facts at ¶ 5 (citing Admin. R. at 542); Pl.'s Resp. at ¶ 5.[9] The STD Plan also provided a variety of circumstances in which BOA would not pay benefits or when BOA would terminate benefits, including when a claimant "fail[s] to . . . provide satisfactory objective medical evidence of disability or continuing disability or other information requested by the STD Claims Administrator." Aetna's Facts at ¶ 6 (citing Admin. R. at 544); Pl.'s Resp. at ¶ 6.

BOA entered into a Benefits Services Agreement ("BSA") with Aetna whereby Aetna, *inter alia*, served as the claims administrator for the STD Plan. Aetna's Facts at ¶ 7 (citing Admin. R. at 359-84, 682-702); Pl.'s Resp. at ¶ 7. Although the BSA had an effective date of January 1, 2009, and an expiration date of December 31, 2013, BOA and Aetna amended the BSA, effective January 1, 2014, to extend the period by which Aetna would serve as the claim administrator through December 31, 2015. Aetna's Facts at ¶ 7 (citing Admin. R. at 680-81); Pl.'s Resp. at ¶ 7. BOA delegated to Aetna, the claims administrator, "authority to decide claims for benefits under the [STD Plan], including denied claims on review" and discretionary authority to

---

[9] With respect to the STD Plan, the SPD states that its purpose is as follows:

> [BOA] provides time off from work and benefits that replace a portion of income if you are disabled, up to a minimum of 26 weeks from the date of your disability, as determined by the Short-term Disability (STD) Claims Administrator and a treating health care provider. For purposes of determining eligibility for STD benefits, disabled is defined as your inability to perform your essential occupation functions, including working your regularly scheduled hours, for more than seven consecutive calendar days because of a pregnancy, illness, injury, organ donation, non-elective surgery or hospitalization.

Pl.'s MSJ at ¶ 9; Aetna's Resp. at ¶ 9; Admin. R. at 542.

make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan, including the establishment of any claims procedures . . .; [t]o construe and interpret the provisions of the Plan . . .; [t]o decide all questions concerning the Plan, including, without limitation, factual questions, and the eligibility of any person to participate in the Plan; . . . [t]o decide disputes arising under the Plan and to make determinations and findings, including, without limitation, factual determinations . . . .

Aetna's Facts at ¶ 8 (citing Admin. R. at 619-20, 623); Pl.'s Resp. at ¶ 8; *see also* Pl.'s MSJ at ¶ 4; Aetna's Resp. at ¶ 4.   BOA also coordinated state disability benefits and contracted with Aetna so that Aetna also administered the state disability programs for employees like the plaintiff that were working in New Jersey.   Aetna's Facts at ¶ 9 (citing Admin. R. at 543); Pl.'s Resp. at ¶ 9.

### b.   BOA's LTD Plan

BOA funded its LTD Plan through a Group Policy titled a "Group Life and Accident and Health Insurance Policy," policy number GP-721040, which Aetna issued on January 6, 2009, and which became effective January 1, 2009 (the "Policy").   Aetna's Facts at ¶ 10 (citing Admin. R. at 1576-1650); Pl.'s Resp. at ¶ 10.   The Policy "consists of all provisions set forth in this document as well as the provisions found in the Certificate, including the *Schedule of Benefits*, issued to covered employees under the group plan."   Aetna's Facts at ¶ 11 (citing Admin. R. at 1636); Pl.'s Resp. at ¶ 11.   The Policy further identified and defined its contents and the type of coverage being provided as it related to "LTD Core and Buy Up," which was a reference to the LTD Plan as further detailed in the Booklet/Certificate and Schedule of Benefits identified on this page as "Book 1" and "SOB 1A," respectively.   Aetna's Facts at ¶ 12 (citing Admin. R. at 1636); Pl.'s Resp. at ¶ 12.

In addition to contracting with Aetna to fund the LTD Plan through the Policy, BOA also contracted with Aetna to administer claims under the LTD Plan.   Aetna's Facts at ¶ 13 (citing Admin. R. at 1648); Pl.'s Resp. at ¶ 13.   In this regard, Aetna had the "complete authority to

review all denied claims for benefits under this Policy."  Aetna's Facts at ¶ 14 (citing Admin. R. at 1648); Pl.'s Resp. at ¶ 14.  BOA also delegated to Aetna "discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein."  Aetna's Facts at ¶ 15 (citing Admin. R. at 1648); Pl.'s Resp. at ¶ 15; *see also* Pl.'s MSJ at ¶ 4; Aetna's Resp. at ¶ 4.  The Policy also provided that Aetna "shall be deemed to have properly exercised such authority unless [it] abuse[s] [its] discretion by acting arbitrarily and capriciously."  Aetna's Facts at ¶ 16 (citing Admin. R. at 1648); Pl.'s Resp. at ¶ 16.  The Policy further stated that Aetna had the "right to adopt reasonable policies, procedures, rules, and interpretations of this Policy to promote orderly and efficient administration."  Aetna's Facts at ¶ 17 (citing Admin. R. at 1648); Pl.'s Resp. at ¶ 17.

As part of the Policy, Aetna prepared, exclusively for BOA, and BOA issued, a "Booklet-Certificate" explaining the conditions and provisions applicable to individuals covered under the LTD Plan and their covered dependents.  Aetna's Facts at ¶ 18 (citing Admin. R. at 1653-85); Pl.'s Resp. at ¶ 18.  The Policy references this Booklet-Certificate as the "Book" in the Policy's "Policy Contents" page.  Aetna's Facts at ¶ 18; Pl.'s Resp. at ¶ 18; Admin. R. at 1636.

The Booklet-Certificate is

part of the *Group Insurance Policy* between Aetna Life Insurance Company and the Policyholder.  The *Group Insurance Policy* determines the terms and conditions of coverage.  **Aetna** agrees with the Policyholder to provide coverage in accordance with the conditions, rights, and privileges as set forth in this *Booklet-Certificate*. . . .  A person covered under this plan and their covered dependents are subject to all of the conditions and provisions of the *Group Insurance Policy.*

The *Booklet-Certificate* describes the rights and obligations of you and **Aetna**, what the plan covers and how benefits are paid for that coverage. . . .

> If you become insured, this *Booklet-Certificate* becomes your *Certificate of Coverage* under the *Group Insurance Policy*, and it replaces and supersedes all certificates describing similar coverage that **Aetna** previously issued to you.

Aetna's Facts at ¶¶ 19-21 (citing Admin. R. at 1655); Pl.'s Resp. at ¶¶ 19-21.  The SPD, the Booklet-Certificate, the Summary of Coverage, and any amendments or riders "comprise the summary plan description (SPD) for the [LTD Plan] as of January 2013."  Aetna's Facts at ¶ 22 (citing Admin. R. at 557); Pl.'s Resp. at ¶ 22.

> The Booklet-Certificate defines the "**Test of Disability**" as follows:

> From the date that you first became disabled and until monthly benefits are payable for 18 months you meet the test of disability on any day that:

> - You cannot perform the **material duties** of your **own occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition; and
> - Your earnings are 80% or less of your **adjusted predisability earnings**.

> ***After the first 18 months of your disability*** that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition.

Aetna's Facts at ¶ 23 (citing Admin. R. at 1660); Pl.'s Resp. at ¶ 23.  According to the terms of the LTD Plan, LTD benefits are payable only after a claimant meets the test of disability and satisfies the 180-day Elimination Period.  Aetna's Facts at ¶ 24 (citing Admin. R. at 1659, 1684); Pl.'s Resp. at ¶ 24.

The Booklet-Certificate and the SPD inform a claimant of the occurrences by which he or she will no longer be considered disabled or eligible for LTD benefits, including (1) on the date Aetna determines that the participant no longer meets the LTD test of disability, or (2) the date a claimant fails to provide proof that he or she meets the LTD test of disability.  Aetna's Facts at ¶ 25 (citing Admin. R. at 1661, 552); Pl.'s Resp. at ¶ 25.  In addition, the Booklet-Certificate and the SPD provide definitions of terms and phrases within the LTD Plan, including the phrase

"own occupation," which the SPD defines as "the occupation that you are routinely performing when your period of disability begins.  Your occupation will be viewed as it is normally performed, without regard to your specific reporting relationship, in the national economy instead of how it is performed for your specific employer at your location or work site."  Aetna's Facts at ¶ 26 (citing Admin. R. at 555, 1675); Pl.'s Resp. at ¶ 26.[10]

### 2. The Plaintiff's Application for STD Benefits

On or about October 18, 2013, the plaintiff initiated her claim for STD benefits through BOA by requesting leave beginning on October 21, 2013.  Aetna's Facts at ¶ 27; Pl.'s Resp. at 27; Pl.'s MSJ at ¶¶ 26, 27; Aetna's Resp. at ¶¶ 26, 27; Admin. R. at 1475.  At the time, the plaintiff was 48 years old.  Pl.'s MSJ at ¶ 11; Aetna's Resp. at ¶ 11.  Her gross annual salary was $108,000.  Pl.'s MSJ at 12; Aetna's Resp. at ¶ 12.

Aetna received the leave request and contacted the plaintiff, by letter dated October 21, 2013, acknowledging her request for leave and identifying the categories of leave being reviewed:  (1) state disability plan; (2) the Federal Family and Medical Leave Act ("FMLA"); and (3) short-term disability.[11]  Aetna's Facts at ¶ 28; Pl.'s Resp. at ¶ 28; Pl.'s MSJ at ¶ 27; Aetna's Resp. at ¶ 27; Admin. R. at 1325-50.  The plaintiff went out on leave (or otherwise stopped working) on October 21, 2013.  Pl.'s MSJ at ¶¶ 11, 13; Aetna's Resp. at ¶¶ 11, 13.  On

---

[10] Although the parties did not note this in their submissions, the SPD and the Booklet-Certificate's definitions, while essentially the same, differ slightly in their construction.  The Booklet-Certificate's definition of "own occupation" is as follows:

> The occupation that you are routinely performing when your period of disability begins.  Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:
>
> - For your specific employer; or
> - At your location or work site; and
> - Without regard to your specific reporting relationship.

Admin. R. at 1675.

[11] The letter contained a "Disability Claim Case No.: 8934655" and a "FMLA Claim No.: 8934652."  Admin. R. at 1325.

October 22, 2013, Aetna requested that the plaintiff's identified primary care physician, Dr. Stanley Bernstein, complete an Attending Physician Statement ("APS") and provide various medical records, including, but not limited to, office visit notes with physical examination findings, diagnostic testing results, medications and any side effects, treatment plans, and a projected return to work date to support the plaintiff's claim for STD benefits and related leaves. Aetna's Facts at ¶ 29 (citing Admin. R. at 1458, 1480); Pl.'s Resp. at ¶ 29.   In response to Aetna's request, Dr. Bernstein provided an APS (dated November 4, 2013) on November 5, 2013, which included (1) a single office visit note dated October 3, 2013, (2) an October 8, 2013 MRI of the brain without contrast, (3) a CT of sinus/facial without contrast, and (4) an October 11, 2013 letter from Dr. Gangadhar Sreepada to Dr. Bernstein.   Aetna's Facts at ¶ 30 (citing Admin. R. at 1455-67, 1489); Pl.'s Resp. at ¶ 30.[12]

Dr. Bernstein's APS indicated that the doctor-patient relationship between him and the plaintiff began on October 3, 2013, the date identified as the first office visit, and Dr. Bernstein was treating the plaintiff every two to four weeks.  Aetna's Facts at ¶ 31 (citing Admin. R. at 1455); Pl.'s Resp. at ¶ 31.  The APS states that the plaintiff was taking daily 30 mg doses of Cymbalta.  Admin. R. at 1455.  In the "Abilities/Limitations" section of the APS, other than indicating that the plaintiff was competent to "endorse checks and direct the use of proceeds thereof," Dr. Bernstein responded "N/A" to the other questions in that section, which included questions about (1) any "medical restrictions/limitations" that he was placing on the plaintiff, and (2) what the plaintiff was "[a]ble to do[.]"  *Id.* at 1456.  Dr. Bernstein also noted that the plaintiff had "improved."  *Id.*; Aetna's Facts at ¶ 33; Pl.'s Resp. at ¶ 33.

---

[12] Aetna's statement of facts omits reference to Dr. Sreepada's October 11, 2013 letter, but it is included in the pages of the Administrative Record Aetna references.

In Dr. Bernstein's office visit notes from October 3, 2013, he states the following regarding the plaintiff's "**History of Present Illness**":

>The patient is a 48 year old female

>Note:  Patient has a history of migraine, allergic rhinitis, depression.  She was on Cymbalta in the past, but does not take it anymore.  She sees Clint Stankowicz in Clinton, psychotherapy, for individual and group sessions that include her family members.

>She was seen on 5/30/12 for CPE.  Her most recent lab test [sic] were done on the same day, and included CBC, CMP, lipids, TSH + free T4, ESR, UA.  The results were all wnl and discussed with patient.

>She complains of severe frontal headache that she was been experiencing for the past 2-3 months.  She mentions increased stress level at work and at home as well as lack of sufficient rest.  She has not been taking vacation time for years.  She had tripped over some obstacle on her kitchen floor and fell approximately three weeks ago.  She hit her face, she did not pass out though and remembers all the details of her fall.  She did not seek any medical help at that time.  She took Cefzil and Avelox in the interim (prescribed by Chilton MD and ENT).

>She states that her headaches have been increasing in frequency and intensity for the past month, and that on 9/29/13 she had to stay in bed all day due to severe headache and general malaise.  She was taking Advil, Tylenol, Excedrin, Sudafed to relieve her headache and sinus congestion, but without much success.

*Id.* at 1460; Aetna's Facts at ¶ 34; Pl.'s Resp. at ¶ 34; Pl.'s MSJ at ¶ 24; Aetna's Resp. at ¶ 24.  In Dr. Bernstein's "**Review of Systems**," he indicated in pertinent part the following:

>**General:**  Present- Chills, Night Sweats, Tiredness and Weight Gain (3 lbs from prior visit).  Not Present- Appetite Loss, Feeling well and Obesity.

>. . .

>**HEENT**: Present- Headache (severe persistent headaches interfering with daily activities, partially relieved by OTC meds), Head Injury (Possibility of head injury: patient fell and hit her face approximately 3 weeks ago[]), Vertigo (occasionally when getting up), Post nasal drip, Nasal Congestion and Rhinitis.  Not present- Blurred vision, Eye Pain, Hearing Loss, Ear Pain and Coryza.

>. . .

> **Neurological**: Present- Numbness (left UE at times) and Paresthesias (left UE at times).
>
> **Psychiatric**: Present- Anxiety (Appears to be very concerned about possible diagnosis, does not stay still[]), Depression (Hx of depression) and Early Awakening.   Not Present- Change in Sleep Pattern, Frequent crying, Hypersomnia, Impaired Cognitive Function and Inability to Concentrate.

Admin. R. at 1460.  For his neurological exam, Dr. Bernstein indicated that the plaintiff was

> alert and oriented x3 with no impairment of recent or remote memory, normal attention span and ability to concentrate, able to name objects and repeat phrases. Appropriate fund of knowledge, normal visual acuity, pupils equal and reactive to light and accommodation, normal sensation of trigeminal nerves, symmetrical functioning of facial nerves, normal hearing, normal gag reflect, symmetrical functioning of accessory nerves, symmetrical functioning of hypoglossal nerve, normal sensation, normal coordination and upper and lower extremity deep tendon reflexes intact bilaterally.

*Id.* at 1461; Aetna's Facts at ¶ 35; Pl.'s Resp. at ¶ 35.

The plaintiff met with Dr. Sreepada for an ENT consult on October 11, 2013.  Pl.'s MSJ

at ¶ 25; Aetna's Resp. at ¶ 25; Admin. R. at 1467.   In Dr. Sreepada's letter to Dr. Bernstein

relating to that visit, Dr. Sreepada noted that the plaintiff was

> complain[ing] of headache for a month described as a band over the face and forehead.   She denies any sinonasal symptoms.   Advil, Tylenol, Excedrin migraine, Sudafed, and Benadryl in varying combinations relieve the symptoms, while antibiotics provide no relief.  Noise aggravates the symptoms.  CT scan of the sinus and MRI of the brain show no significant intracranial or sinonasal pathology.

Admin. R. at 1467; Pl.'s MSJ at ¶ 25; Aetna's Resp. at ¶ 25.  Dr. Sreepada indicated that the

plaintiff "suffers from headache not of sinonasal etiology.  Consideration for migraine, tension,

cervical spine, and myofascial etiologies is given."  Admin. R. at 1467; Pl.'s MSJ at ¶ 25;

Aetna's Resp. at ¶ 25.  Dr. Sreepada stated that she "placed [the plaintiff] on a Medrol dose pack

to give her relief, and I recommend that she follow-up with you [(Dr. Bernstein)].  Consideration

for neurologic and rheumatologic evaluations should be given."  Admin. R. at 1467; Pl.'s MSJ at

¶ 25; Aetna's Resp. at ¶ 25.

By letter dated November 7, 2013, Aetna informed the plaintiff that it had denied her claim for STD benefits.  Admin. R. at 1359-60.  This letter indicated that it was sent regarding "Short Term Disability Claim Denial," and it contained a claim number of 8934655, which was the claim number indicated on Aetna's October 21, 2013 letter that related to the "Disability Claim."  Admin. R. at 1325, 1359.  In this November 7, 2013 letter, the Aetna representative (identified as Courtney Martin, STD/LOA Benefit Manager), indicated that she had reviewed the plaintiff's file in full and she determined that

> there is insufficient clinical information to support your inability to perform the essential elements of your occupation as a Mortgage Loan Officer effective 10/21/2013.  The documentation received did not provide specific physical examination findings which would prevent you from performing the core elements of your occupation.  Examples of such findings would be physical examination abnormalities including signs or symptoms of nausea and vomiting, sound or light sensitivity, fatigue, visual impairments; lab abnormalities, and diagnostic study results to support a functional defect.  The frequency and duration of the headaches should also be provided.  As a result of the above information, no Short Term Disability benefits are payable on this claim.

Admin. R. at 1359.  The representative also informed the plaintiff that

> [t]o perfect your claim, provide proof that you were totally disabled from performing each of the material duties of your regular job, and that you were receiving appropriate care and treatment from a doctor on a continuing basis.

> We will review any additional information you submit, such as medical information from any medical providers who have treated you for the condition(s) in question, including but not limited to:

> - A detailed narrative report for the period beginning 10/21/2013, outlining specific physical and/or mental limitations and restrictions related to your disability claim
> - Your treating medical provider's prognosis, including current course of treatment, frequency of visits, and specific medications prescribed
> - Copies of diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings
> - Any documents or information specific to the condition(s) for which you are claiming disability and which would assist in the evaluation of your disability claim

- Any other information or documentation you believe may assist us in reviewing your claim.

*Id.* at 1359-60.

By another letter dated November 7, 2013, Aetna indicated that it had "received and reviewed your claim for short term disability benefits" and had approved this claim. Admin. R. at 1363-64.   The letter indicated that it was sent regarding "**Initial Disability and Leave Approval Letter**," and it contained the claim number for the "FMLA Claim" noted in Aetna's October 21, 2013 letter.  *Id.* at 1325, 1363.  In this second November 7, 2013 letter, Aetna states that the plaintiff's "short term disability benefits will begin on 10/21/2013 and are approved through 11/17/2013."  *Id.* at 1363.  The letter further states that the plaintiff was approved for BOA Medical Leave, FMLA leave, and New Jersey Statutory Leave.  *Id.*

Through a letter dated November 21, 2013, the plaintiff authorized her husband ("Mr. Ackaway") to act on her behalf and requested a review of her claim for STD benefits.  Aetna's Facts at ¶ 39 (citing Admin. R. at 1271); Pl.'s Resp. at ¶ 39.  Aetna assigned the plaintiff's appeal to Lesterine Fowler ("Fowler"), an appeal specialist, who attempted an outreach call to Mr. Ackaway; however, Mr. Ackaway refused to answer any questions and requested Fowler to send him the questions in writing.  Aetna's Facts at ¶ 40 (citing Admin. R. at 1276); Pl.'s Resp. at ¶ 40.  Via a letter dated November 22, 2013, Aetna sent to Ms. Ackaway two forms:  an "Authorization For Aetna To Request Protected Health Information Necessary To Process A Disability Claim" and a "Disability Appeal Request Form."  Aetna's Facts at ¶ 41; Pl.'s Resp. at ¶ 41; Admin. R. at 1205-10.  Fowler called the plaintiff again and left a message informing the plaintiff that she only had one opportunity to appeal and encouraging her to submit any additional information for review on appeal.  Aetna's Facts at ¶ 42 (citing Admin. R. at 1276); Pl.'s Resp. at ¶ 42.

On or about December 10, 2013, the plaintiff submitted a completed Disability Appeal Request Form indicating that she was appealing from the denial of her claim for STD benefits.[13] Pl.'s MSJ at ¶ 32; Aetna's Resp. at ¶ 32; Admin. R. at 1258-59.  On this form, the plaintiff indicated that she was appealing because "[y]our decision was made prior to reviewing the pertinent results of tests and reports from my neurologist."  Admin. R. at 1258; Aetna's Facts at ¶ 46; Pl.'s Resp. at ¶ 46.  The plaintiff also indicated that the "condition(s) that [were] preventing [her] from returning to work" were "Severe and debilitating Headaches[;] Short Term Memory Loss[; and] Inability to Drive a Car at times due to migraines."  *Id.* at 1259.  She further indicated that the "aspects of [her] job [she was] unable to perform and why" were: "The above without medication prevented any aspect of any job to be performed.  With medication the headaches have slightly improved however, the initial usage of the drug results in loss of memory, concentration, acroparesthesia, extreme fatigue."  *Id.*; Aetna's Facts at ¶ 48; Pl.'s Resp. at ¶ 48.  The plaintiff stated that she had submitted all medical records.  Aetna's Facts at ¶ 48 (citing Admin. R. at 1259); Pl.'s Resp. at ¶ 48.

Attached to the Disability Appeal Request Form were a December 3, 2013 APS and November 5, 2013 office visit notes ("OVN") from Dr. David Safar, a psychiatrist and neurologist with whom the plaintiff began treating on November 5, 2013.  Aetna's Facts at ¶ 43 (citing Admin. R. at 1264-70); Pl.'s Resp. at ¶ 43; Pl.'s MSJ at ¶ 34; Aetna's Resp. at ¶ 34.[14]  In the November 5, 2013 OVN, Dr. Safar noted that the plaintiff reported that she developed

---

[13] The form contained a handwritten date of "12/10/13."  Admin. R. at 1259.

[14] It appears that the plaintiff provided Dr. Safar's December 3, 2013 APS and November 5, 2013 office visit notes on or about December 4, 2013.  Aetna's Facts at ¶ 43; Pl.'s Resp. at ¶ 43; Aetna's Resp. at ¶ 34 (citing Admin. R. at 1275 (indicating Aetna received correspondence including "APS, OV NOTE AND MRI OF THE BRAIN")).  Aetna also asserts that Dr. Safar provided copies of the CT Scan and MRI from October 8, 2013 that Dr. Bernstein already provided to Aetna.  Aetna's Facts at ¶ 43; Aetna's Resp. at ¶ 34.

The timing of the submission of these documents or how Aetna eventually received them is ultimately irrelevant because there does not appear to be a dispute that Aetna had these records when addressing the plaintiff's appeal from the denial of her claim for STD benefits.

Case 2:14-cv-01300-EGS   Document 42   Filed 09/30/16   Page 22 of 65

headaches "3 months ago," beginning as generalized pressure and associated with light sensitivity and noise but no nausea or vomiting. Aetna's Facts at ¶ 44; Pl.'s Resp. at ¶ 44; Admin. R. at 1267. Dr. Safar's physical exam findings were all within normal limits, and he concluded with the impression that the plaintiff had chronic daily headaches.[15] Aetna's Facts at ¶ 44; Pl.'s Resp. at ¶ 44; Admin. R. at 1267-68. Dr. Safar indicated that he discussed pathophysiology [and] treatment [both] abortive [and] preventative" with the plaintiff. Aetna's Facts at ¶ 44; Pl.'s Resp. at ¶ 44; Admin. R. at 1268. Dr. Safar also indicated that he advised her to begin treating with Topamax, and he noted that the plaintiff would "advise" him about it. Aetna's Facts at ¶ 44; Pl.'s Resp. at ¶ 44; Admin. R. at 1268.

In Dr. Safar's December 3, 2013 APS, he identified the plaintiff's primary diagnosis as "CHRONIC DAILY HEADACHE." Admin. R. at 1265; Pl.'s MSJ at ¶ 35; Aetna's Resp. at ¶ 35. Dr. Safar indicated that there were no complications and no objective findings. Admin. R. at 1265. He noted that the plaintiff's subjective symptom was a "headache." *Id.* He also noted that the plaintiff was currently taking 25 mg of Topiramate.[16] *Id.*

In the "Progress" section of the APS, Dr. Safar indicated that the plaintiff's status had "[i]mproved." Admin. R. at 1266. He also indicated that the plaintiff had not yet achieved maximum medical improvement, but he expected fundamental changes in her condition in 1-2 months. *Id.* In addition, he noted the following restrictions: "PROLONGED COMPUTER WORK; AVOID INTENSE AND STRESSFUL SITUATIONS [&] NOISY ENVIRONMENT." *Id.* He further indicated the plaintiff had the following physical or mental impairments:

---

[15] In Aetna's statement of facts, it asserts that Dr. Safar "did not identify or other [sic] report any mental impairments such as fatigue, decreased memory and concentration." Aetna's Facts at ¶ 44. The plaintiff noted her belief that Aetna had fairly accurately summarized Dr. Safar's OVN. Pl.'s Resp. at ¶ 44. Nonetheless, the court notes that it appears that in his "REVIEW OF SYSTEMS" for "Psych," Dr. Safar circled "Depression" and "Anxiety." *See* Admin. R. at 1267. In this same review, for "Constitutional," Dr. Safar circled "Fatigue." *Id.*

[16] Although not stated by Dr. Safar in this document, both counsel indicate that this medication was Topamax.

22

"FATIGUE; ACROPATHESTHSIA; ↓ MEMORY/CONCENTRATION."  *Id.*  With regard to the date that the plaintiff would be able to return to full duty, Dr. Safar noted that he was going to reevaluate her status after one month.  *Id.*

As for the plaintiff's "Level of Impairment," Dr. Safar indicated that she had a "Class 4" physical impairment, meaning that she had a "[m]arked limitation of functional capacity/capable of sedentary work."  *Id.*; Pl.'s MSJ at ¶ 36; Aetna's Resp. at ¶ 36.  Dr. Safar further indicated that the plaintiff had a "[m]ental/[n]ervous [i]mpairment," in the nature of a "[m]arked limitation: unable to engage in stress or interpersonal relationships."[17]  Admin. R. at 1266; Pl.'s MSJ at ¶ 37; Aetna's Resp. at ¶ 37.

On December 12, 2013, Fowler referred the plaintiff's claim file for an independent peer review by Dr. Vaughn Cohan, who is Board Certified in Psychiatry and Neurology.  Admin. R. at 1226, 1229; Aetna's Facts at ¶ 49; Pl.'s Resp. at ¶ 49.  In Dr. Cohan's physician review dated December 20, 2013, he indicated that he reviewed the following:[18]

> Job description
> STD claim denial letter dated 11/7/13
> Appeal letter dated 11/21/13
> Disability Appeal Request Form dated 12/10/13
> Authorization dated 10/31/13
> Progress notes dated 10/3/13
> CT scan dated 10/8/13
> MRI report of brain dated 10/8/13
> Correspondence from Dr. Gangadhar Sreepada dated 10/11/13
> Attending Physician Statement dated 11/4/13
> Progress notes from Dr. David Safar dated 11/5/13, 12/3/13

Admin. R. at 1227; Aetna's Facts at ¶ 49; Pl.'s Resp. at ¶ 49.[19]

---

[17] While the form is somewhat unclear, it appears that this was also a Class 4 "Mental/Nervous Impairment."

[18] It appears that Dr. Cohan dictated the report on December 18, 2013.  Admin. R. at 1229.

[19] The plaintiff "strongly denie[s] that Dr. Cohan – or for that matter anyone within Aetna – actually considered 'plaintiff's job description.' – This is nowhere to be found within Dr. Cohan's report."  Pl.'s Resp. at ¶ 49.  As indicated in this sentence, Dr. Cohan expressly states that he reviewed the plaintiff's "[j]ob description," although he does not actually describe the plaintiff's job description in the narrative portion of the review.  Admin. R. at 1227-29.

As part of Dr. Cohan's review, he conducted a peer-to-peer consultation with Dr. Safar on December 16, 2013.  Aetna's Facts at ¶ 50; Pl.'s Resp. at ¶ 50; Pl.'s MSJ at ¶ 44; Aetna's Resp. at ¶ 44; Admin. R. at 1228.  During this consultation, Dr. Safar indicated that he first saw the plaintiff on November 5, 2013, and he "diagnosed her with chronic daily headaches of three months' duration associated with light and noise sensitivity, primarily in the work place."  Admin. R. at 1228; *see* Pl.'s MSJ at ¶ 46; Aetna's Resp. at ¶ 46.  Dr. Safar also "stated that these symptoms precluded the [plaintiff] from work per her own self-reported history."  Admin. R. at 1228.  Dr. Safar further stated that the plaintiff "requested a period of five to six months off work, but [he] would not support that request."  *Id.*  Dr. Cohan noted that "[i]t was Dr. Safar's opinion that the [plaintiff] did require a temporary period of absence from work while undergoing initial treatment and adjustment in her prophylactic therapy.  However, he did not consider that she would require a lengthy absence from work as [she] had requested."  *Id.*; *see* Pl.'s MSJ at ¶ 47; Aetna's Resp. at ¶ 47.  Dr. Safar also informed Dr. Cohan that he had started the plaintiff on Topamax, "which was well tolerated and which resulted in a decrease in her headache frequency and severity," and he had increased the dosage as of her last visit on November 27, 2013.  *Id.*; *see* Pl.'s MSJ at ¶ 46; Aetna's Resp. at ¶ 46.

Dr. Cohan also conducted a peer-to-peer consultation with Dr. Bernstein on December 17, 2013.  Aetna's Facts at ¶ 51; Pl.'s Resp. at ¶ 51; Pl.'s MSJ at ¶ 44; Aetna's Resp. at ¶ 44; Admin. R. at 1228.  During the consultation, Dr. Bernstein stated that he first saw the plaintiff on October 3, 2013, when she was complaining of a frontal headache of two to three months "associated with stress at home and in the workplace."  Aetna's Facts at ¶ 51; Pl.'s Resp. at ¶ 51; Pl.'s MSJ at ¶ 45; Aetna's Resp. at ¶ 45; Admin. R. at 1228.  Dr. Bernstein saw the plaintiff at a follow-up on November 4, 2013, where she "continued to report daily headaches associated with

stress and she complained of sinus congestion and nasal stuffiness." Aetna's Facts at ¶ 51; Pl.'s Resp. at ¶ 51; Admin. R. at 1228. Dr. Bernstein informed Dr. Cohan that "[h]e recommended disability extension for a period of two weeks thereafter due to the above-mentioned complaints, but the claimant did not appear to be in significant distress when seen in his office." Admin. R. at 1228. Dr. Bernstein noted that the plaintiff "recommended time off work . . . for the purpose of completing further diagnostic testing and neurologic consultation." Aetna's Facts at ¶ 51; Pl.'s Resp. at ¶ 51; Admin. R. at 1228. Dr. Bernstein also added that the plaintiff did not return for a scheduled return visit. Aetna's Facts at ¶ 51; Pl.'s Resp. at ¶ 51; Admin. R. at 1228.

Based upon the peer-to-peer consultations and the medical records the plaintiff submitted in support of her claim for STD benefits, Dr. Cohan opined that there was nothing in the medical records showing that the plaintiff's chronic daily headaches were "sufficiently severe or intense as to preclude work." Aetna's Facts at ¶ 52; Pl.'s Resp. at ¶ 52; Admin. R. at 1228. Dr. Cohan noted the absence of symptoms such as nausea or vomiting, coupled with the lack of "a frequent or emergency basis for analgesics." Aetna's Facts at ¶ 51; Pl.'s Resp. at ¶ 51; Admin. R. at 1228. As such, he concluded that "the documentation provided is not indicative of a functional impairment that would have precluded the claimant from performing her own occupation from 10/21/13 through 1/2/14 while undergoing further medical evaluation, specialty consultation, and adjustment in her pharmacologic therapy." Admin. R. at 1228. He also concluded that the plaintiff "would be considered capable of performing work at a sedentary or light physical demand level." Aetna's Facts at ¶ 53; Pl.'s Resp. at ¶ 53; Admin. R. at 1228.

By a letter dated December 27, 2013, Aetna upheld its original decision denying the plaintiff's claim for STD benefits. Pl.'s MSJ at ¶ 38; Aetna's Resp. at ¶ 38; Aetna's Facts at ¶

54; Pl.'s Resp. at ¶ 54; Admin. R. at 1211-12.[20]  In reaching this decision, Aetna did not engage a physician to physically examine the plaintiff.  Pl.'s MSJ at ¶ 39; Aetna's Resp. at ¶ 39.[21]

In the letter, Fowler identified and discussed the records provided by the plaintiff and Dr. Cohan's peer review.  Admin. R. at 1211-12.  Fowler noted that although the plaintiff "presented with chronic daily headaches of several months' duration, . . . the medical records did not describe those headaches as sufficiently severe or intense as to preclude work."  Aetna's Facts at ¶ 54; Pl.'s Resp. at ¶ 54; Admin. R. at 1212.  In addition, Fowler indicated that the records showed that the plaintiff was alert, in no acute distress, and had normal speech, cognition, and memory.  Aetna's Facts at ¶ 54; Pl.'s Resp. at ¶ 54; Admin. R. at 1211-12.  As such, Aetna concluded that "the documentation provided was not indicative of a functional impairment that would have precluded you from performing your own occupation."  Aetna's Facts at ¶ 54; Pl.'s Resp. at ¶ 54; Admin. R. at 1212.

### 3.      The Plaintiff's Application for LTD Benefits

Nearly a year after Aetna denied the plaintiff's claim for STD benefits, she submitted a claim for LTD benefits under the LTD Plan on or about December 18, 2014.  Aetna's Facts at ¶ 55 (citing Admin. R. at 1091-92); Pl.'s Resp. at ¶ 55.[22]  Aetna assigned Disability Benefit Manager Bill Faber ("Faber") to review the claim for LTD benefits.  Aetna's Facts at ¶ 55 (citing Admin. R. at 1091-92); Pl.'s Resp. at ¶ 55.

---

[20] As noted by the plaintiff, this document contained a third case number, namely claim case no. 8934654.  Admin. R. at 1211.

[21] There also appears to have been issues with Aetna's representatives orally communicating with the plaintiff as it appears that the plaintiff and Mr. Ackaway did not want to speak to those representatives.  Admin. R. at 1275-76, 1278-79.  There is also a notation from an Aetna representative indicating that Mr. Ackaway demanded that Aetna only communicate with them in writing.  Admin. R. at 1276.  Regardless, it does not appear that Aetna representatives spoke to the plaintiff during this process.

[22] The parties have acknowledged that the plaintiff later became aware of her ability to apply for LTD benefits.  Pl.'s MSJ at ¶¶ 57, 58; Aetna's Resp. at ¶¶ 57, 58.  The instant civil action had already been pending for months by the time she applied for LTD benefits.

In support of this claim, the plaintiff submitted records from January 16, 2014, through October 2014, spanning various physicians, but primarily Dr. Karpinski-Failla, Dr. Bernstein, Dr. Safar, and Dr. Mascellino.  Aetna's Facts at ¶ 56 (citing Admin. R. at 982-84); Pl.'s Resp. at ¶ 56.  Dr. Safar's records covered the period of time from January 2014 through April 2014, which indicated treatment and office visits on January 16, 2014, February 21, 2014, April 11, 2014, and April 28, 2014.  Aetna's Facts at ¶ 57; Pl.'s Resp. at ¶ 57; Pl.'s MSJ at ¶ 62; Aetna's Resp. at ¶ 62; Admin. R. at 1013-18.  Included in the records is a January 16, 2014 office visit note with a corresponding prescription note, which authorized the plaintiff to return to work as of January 20, 2014.[23]  Aetna's Facts at ¶ 57; Pl.'s Resp. at ¶ 57; Admin. R. at 1013-14.  In this office visit note, Dr. Safar also stated:  "Headaches recur daily, endure for ≤ 12 hrs, [&] are ≤ in severity."  Dr. Safar indicated that they would "[m]aintain Topa at 125 for 1 month."  Admin. R. at 1013.  The office visit notes for the three visits after January 16, 2014, did not reference the plaintiff returning to work, although Dr. Safar's February 21, 2014 office visit note indicated that the plaintiff, as discussed below, "was excused from work until 3-13-14" due to a foot ailment.  Admin. R. at 1015, 1016-18; Aetna's Facts at ¶ 57; Pl.'s Resp. at ¶ 57.

Dr. Safar's February 21, 2014 office visit notes indicated he still assessed her with chronic daily headaches (2-3 times per day) that were "6/10 in severity" and lasted for less than or equal to 2 hours.[24]  Admin. R. at 1015.  The plaintiff was still taking 125 mg of Topamax,

---

[23] The plaintiff asserts that she <u>requested</u> that Dr. Safar write the note because she "hoped" to return to work on January 20, 2014.  Pl.'s Resp. at ¶ 57; Pl.'s MSJ at ¶ 61.  Aetna opposes these statements because there is no indication in Dr. Safar's note or reports that the plaintiff requested the note or that she hoped to return to work on January 20, 2014.  Aetna's Resp. at ¶¶ 60-61.  The court has not located any evidence in the record to support the plaintiff's statement in her submissions that she requested the note or that she "hoped" to return to work on January 20, 2014.

[24] The court notes that Dr. Safar's notes are organized into sections identified by capital letters spelling the word "SOAP."  While the court does not have any document in the record to assist with interpreting Dr. Safar's use of those letters, the court notes that other courts have recognized that SOAP is "[a]n acronym for "Subjective, Objective, Assessment, Plan, a widely-used method of recording medical observations."  *Ferry v. Prudential Ins. Co. of Am.*, No. 2:10-cv-211-GZS, 2011 WL 4828816, at *5 n.4 (D. Maine Oct. 10, 2011); *see McKnight v. Astrue*,

which resulted in intermittent confusion and tingling.  *Id.*  His notes reflected that the plaintiff denied any change in vision.  *Id.*  The plaintiff also apparently reported that her left foot was "crushed" 3 days prior and she was excused from work until March 13, 2014.  *Id.*

In Dr. Safar's April 11, 2014, and April 28, 2014 office visit notes, he noted that the plaintiff was complaining of right-sided ear pain with decreased hearing.[25]  Admin. R. at 1017-18.  Pl.'s MSJ at ¶ 64; Aetna's Resp. at ¶ 64.  He assessed her with cephalalgia and dizziness.  Admin. R. at 1017-18; Pl.'s MSJ at ¶ 64; Aetna's Resp. at ¶ 64.  The April 11, 2014 note contains a reference to "Topamax 125 mg controls her migraines," and the April 28, 2014 note indicates that despite a lower appetite, the plaintiff did not want to stop Topamax inasmuch as it is helping.  Admin. R. at 1017-18.

Dr. Susan Karpinski-Failla's records covered a period from January 2014 through May 2014.  Aetna's Facts at ¶ 58; Pl.'s Resp. at ¶ 58; Admin. R. at 1025-39.  Dr. Karpinski-Failla's office visit notes from January 2, 2014, indicate that the plaintiff was complaining of headaches that affected her entire head.  Admin. R. at 1025.  The notes also list the plaintiff's chronic problems as:  anxiety, depressive disorder, not elsewhere classified, generalized anxiety disorder, and migraines.[26]  *Id.*  The plaintiff did not report blurred vision or memory loss.  *Id.* at 1026.  For the plaintiff's migraines, the office visit notes indicate that she would "[c]ontinue care with Neuro / and taper with [T]opamax hopefully they will decrease in frequency."  *Id.* at 1027.

---

No. 4:10-cv-2126, 2011 WL 5026223, at *8 n.30 (M.D. Pa. Oct. 21, 2011) ("'SOAP' is an abbreviation for subjective, objective, assessment, and plan.").

[25] It appears that on March 19, 2014, the plaintiff visited Dr. Sreepada regarding her right ear pain.  Pl.'s MSJ at ¶ 66; Aetna's Resp. at ¶ 66; Admin. R. at 1043-47.  Dr. Sreepada's notes reflect that during a visit to the emergency room the plaintiff had an episode of vomiting and vertigo.  Admin. R. at 1043.

[26] Although Dr. Karpinski-Failla's notes also list additional ailments such as fatigue, phonophobia, photophobia and insomnia, they also appear to conflict in some respects.  Admin. R. at 1025-26.  In this regard, although Dr. Karpinski-Failla's review of systems in the "**Neuro/Psychiatric**" area is "positive for" dizziness, with respect to the "**HEENT**" (believed to be head, ears, eyes, nose and throat) system, the plaintiff was "negative for" dizziness.  *Id.*  In addition, despite a notation that one of the plaintiff's chronic problems was a depressive disorder, Dr. Karpinski-Failla indicated that the plaintiff was "negative for" depression.  *Id.*

On Dr. Karpinski-Failla's office visit notes for January 30, 2014, she noted that the plaintiff still had anxiety and headaches.[27]   Admin. R. at 1029.   Under the "**Assessment/ Plan**" portion of the note, it indicates with respect to the migraines that "[f]orms completed for 6 weeks more of leave from work / She will continue care with her neurologist [w]ho is managing her [T]opamax."   *Id.* at 1031.   In addition, the notes indicate that the plaintiff had stopped seeing her therapist, and Dr. Karpinski-Failla had a "[l]ong discussion" with the plaintiff and her husband that included advice that the plaintiff "restart" therapy.   *Id.* at 1029, 1031.

Dr. Karpinski-Failla's office visit notes for the plaintiff's visit on April 1, 2014, reflect that the plaintiff presented with generalized anxiety disorder and migraine headaches.   *Id.* at 1033.   As for the headaches, the doctor stated as additional information: "Increase headaches with ear issues[.]"   *Id.*   With regard to the treatment plan, Dr. Karpinski-Failla, "[s]trongly encouraged" the plaintiff to "seek help from a psychiatrist in addition to therapy."   *Id.* at 1035.   Additionally, the doctor stated that she "can give a few more weeks but if further time off from work will need to get from either neurologist or psychiatrist."   *Id.*

The office visit notes from Dr. Karpinski-Failla for the plaintiff's visit on April 29, 2014, reflect that she appeared with a bad cold/cough and was having issues with depression and weight loss.   *Id.* at 1037.   The notes reflected a "chronic problem" with migraines.   *Id.*   During the doctor's review of symptoms, she indicated that the plaintiff was negative for "dizziness, headache and syncope."   *Id.* at 1038.   With regard to the plaintiff's chronic depressive disorder, not otherwise classified, Dr. Karpinski-Failla stated that "I still wish you to see [t]herapist and a psychiatrist."   *Id.* at 1039.

The plaintiff again received treatment from Dr. Bernstein in May 2014 and June 2014, as reflected in his office visit notes.   Aetna's Facts at ¶ 59; Pl.'s Resp. at ¶ 59; Admin. R. at ¶¶ 927-

---

[27] As with Dr. Karpinski-Failla's prior office visit note, she listed the pain scale as "0/10."   Admin. R. at 1025, 1029.

30, 1006-12.  In Dr. Bernstein's "Review of Systems" as part of his May 15, 2014 office visit notes, he noted that with regard to the plaintiff's headaches, they were "episodic, frontal, different from migraines that the patient used to have as per pt)."  Admin. R. at 1006.  He referenced that the plaintiff was starting (as of May 15, 2014) Topamax 25 mg, 5 tablets per day.  Admin. R. at 1008.  Dr. Bernstein's plan with regard to this visit related to the plaintiff's sinus congestion and ear pain.  *Id.*  He also provided the plaintiff with the name of a migraine specialist, Dr. Ann Marie Mascellino, to see if the plaintiff could see her as a second opinion.  Pl.'s MSJ at ¶ 70; Aetna's Resp. at ¶ 70; Admin. R. at 1010.

In Dr. Bernstein's June 5, 2014 office visit note, he set forth the following "History Note:"

> A 49-year old W/F who is seen in followup.  Her last visit was noted in our office from May 15, 2014.  She had severe migraines. She has been seen by Dr. Safar, neurology.  She is on Topamax now at 150 mg a day.  She had been on Wellbutrin from her LMD in Plain and she stopped the Wellbutrin abruptly two days ago.  She is on Flonase if needed.  She has had an ear problem, she saw Dr. Anthony Jahn, tertiary care ENT and she was placed on steroids.  I have not received a full note from Dr. Jahn, although I had a verbal communication.  She has had some improvement.  We did discuss her MRI of her brain and with findings of her sinus inflammation.  The patient has had severe migraines.  She notes that she had some improvement, now this seemed to have recurred.  She is concerned that the Wellbutrin has provoked the migraines and has made the migraines worse, although she has been on it for several months.

Pl.'s MSJ at ¶ 68; Aetna's Resp. at ¶ 68; Admin. R. at 1009.

Dr. Bernstein also provided a handwritten note dated June 6, 2014, which he referenced the plaintiff's June 5, 2014 visit to his office and provided copies of "a recent visit to our office 5/15/14 and neurology 4/28/14."  Pl.'s MSJ at ¶ 69; Aetna's Resp. at ¶ 69; Admin. R. at 1011.  He also stated that the plaintiff's "meds were increased (Topamax and Prednisone)" and she "still is unable to work."  Admin. R. at 1011.

As indicated above, Dr. Bernstein provided the name of Dr. Mascellino to the plaintiff, and the plaintiff visited Dr. Mascellino on June 10, 2014, and continued treating with her through October 2014.  Admin. R. at 992-1004; Pl.'s MSJ at ¶ 71; Aetna's Resp. at ¶ 71.  In a letter dated that same date and directed to Dr. Bernstein, Dr. Mascellino recounted the plaintiff's history and present symptoms.  Admin. R. at 992-93.  These included the plaintiff's history with headache issues and her description of the "worsening" of her headaches since March 2014.  *Id.* at 992.  Dr. Mascellino noted that the plaintiff's headache triggers included "lack of sleep, anxiety, and certain foods."  *Id.*  Dr. Mascellino set forth a treatment plan with the plaintiff that included modifying her medications and ordering testing such as an MRA of the brain and a hypercoagulable workup.  *Id.* at 993.

By August 6, 2014, Dr. Mascellino noted that her prescribed medication of Sulindac 200 mg had helped the plaintiff and "ke[pt] her headaches away for several days' time."[28]  Admin. R. at 1000.  Dr. Mascellino's plan was to taper the Topamax from 150 mg to 125 mg to assist with any issues with memory or hair loss.  *Id.* at 1001.

Dr. Mascellino's last letter to Dr. Bernstein is dated October 14, 2014, and reflects her notes from the plaintiff's visit on that date.  Admin. R. at 1003-04.  Dr. Mascellino's letter states that the plaintiff had tried to drop her dosage of Topamax to 100 mg per day, but when she did so her headaches increased.  *Id.* at 1003.  As a result, she went back to 125 mg of Topamax.  *Id.*

Dr. Mascellino also noted that the plaintiff's "headaches overall seem better.  She will have more mild headaches.  She has not had any very severe migraines.  She does take the sulindac only when absolutely necessary.  [She] has not complained of double or blurred vision or any new headache features."  *Id.*  Among Dr. Mascellino's impressions was that the "migraine without aura, . . . appears under good control."  *Id.* at 1004.

---

[28] It also appeared that the tests ordered by Dr. Mascellino did not show any issues.  Admin. R. at 1000.

Aetna received an October 15, 2014 Behavioral Health Clinician Statement, Attending Physician Statement, and a Capabilities and Limitations Worksheet from Dr. Mascellino. Aetna's Facts at ¶ 61; Pl.'s Resp. at ¶ 61; Admin. R. at 1082-89.  In the Attending Physician Statement, Dr. Mascellino's primary diagnosis was "chronic daily headache" and the secondary diagnosis was vestibular neuronitis.  *Id.* at 1082.  Dr. Mascellino indicated that although the plaintiff was able to, *inter alia*, work with others, give supervision, and work cooperatively with others in a group setting, she had no ability to work.  *Id.* at 1083.  She further indicated that she had prescribed a restriction on the plaintiff's work activities since June 14, 2014, and the restrictions or limitations would remain in effect for an undetermined period.  *Id.*  These restrictions and limitations are also referenced in the Capabilities and Limitations Worksheet, which indicated that the plaintiff had "severe headaches, dizziness, and ear pain [and] balance problems." *Id.* at 1085.

As for the Behavioral Health Clinician Statement, Dr. Mascellino indicated that the plaintiff's progress was "unchanged" and her diagnostic impressions were "head[ache]/vestibuler [sic] have dysfunction."  *Id.* at 1087.  Dr. Mascellino stated that the plaintiff's cognitive functioning was normal and otherwise unremarkable.  Aetna's Facts at ¶ 61; Pl.'s Resp. at ¶ 61; Admin. R. at 1088.

With regard to the plaintiff's right ear issues, the plaintiff provided Aetna with medical records related to her treatment for right ear pain causing dizziness and vertigo during March 2014.  Aetna's Facts at ¶ 62; Pl.'s Resp. at ¶ 62; Admin. R. at 1043-1067.  In addition, the plaintiff provided Aetna with a letter dated May 21, 2014, from Dr. Anthony M. Jahn, an ENT, to Dr. Bernstein.  Aetna's Facts at ¶ 63; Pl.'s Resp. at ¶ 63; Admin. R. at 1020-21.  After reviewing the plaintiff's symptoms and films and after conducting his review of her systems, Dr.

Jahn "believe[d] she has lingering eustachian tube dysfunction which can be treated with either a myringotomy or steroids."  Admin. R. at 1021.  The plaintiff desired a course of prednisone, so he prescribed it to her.  *Id.*  Dr. Jahn also noted that "[t]he unusual feature in this case is her significant symptomology which cannot be explained by either her history of [sic] by physical findings."  Aetna's Facts at ¶ 63; Pl.'s Resp. at ¶ 63; Admin. R. at 1021.

On February 3, 2015, in further support of the plaintiff's LTD claim, her counsel submitted additional records including those of her March 13, 2014 emergency room visit related to the ongoing ear pain involving fluid, an office visit note from Dr. Bernstein from November 3, 2014, and a headache log.  Aetna's Facts at ¶ 65; Pl.'s Resp. at ¶ 65.  The headache log covered a two-week period from January 8, 2015, through January 21, 2015, identifying various aspects of the headaches the plaintiff suffered from during that period.[29]  Aetna's Facts at ¶ 66; Pl.'s Resp. at ¶ 66; Admin. R. at 932-33.  The records from the emergency room visit indicate that (1) the plaintiff was complaining of right ear pain and head pain that started that afternoon, (2) the plaintiff rated the pain as a "10" on a scale of 0-10, (3) a nurse practitioner successfully removed cerumen from the plaintiff's right ear (although the plaintiff appears to have had difficulty with the procedure), and (4) the plaintiff was diagnosed with "right otitis media."[30]  Admin. R. at 920-26.

The plaintiff's last visit with Dr. Bernstein prior to Aetna's decision regarding her claim for LTD benefits occurred on November 3, 2014.  Admin. R. at 927-30.  During Dr. Bernstein's

---

[29] On or about January 7, 2015, an Aetna representative appears to have conducted an interview of the plaintiff. Admin. R. at 1115-20.  During this interview, the plaintiff and the representative discussed headache logs.  *Id.* at 1119.  The notes from this meeting reflect that the plaintiff stated that she had been keeping a log on her calendar. *Id.*  The plaintiff asked the representative to send her a headache log, although it is unclear whether they would be communicating through the plaintiff's attorney.  *Id.*

The court notes that the parties dispute whether the representative asked the plaintiff to complete the log or if the plaintiff asked for a log so she could complete it.  *See, e.g.*, Pl.'s MSJ at ¶ 77; Aetna's Resp. at ¶ 77.  For purposes of the court's analysis, the particular issue as to who requested the log is irrelevant.

[30] *See Fred-Perez v. Barnhart*, 450 F. Supp. 2d 461, 463 (D. Del. 2006) (noting "right otitis media" as "an ear infection").

"Review of Systems," he noted that, *inter alia*, the plaintiff:  (1) "does have some weight loss possibly due to Topamax;" (2) "has had migraines which have been disabling;" (3) "has dizziness and lightheadedness which has been persistent;" and (4) "has some cognitive deficit, numbness and tingling, paresthesias which may all be due to Topamax."  *Id.* at 928.  In addition, Dr. Bernstein relayed Dr. Mascellino's note that when she tapered the Topamax the plaintiff "had severe headache again."  *Id.*

During his physical examination of the plaintiff, Dr. Bernstein noted that, *inter alia*, (1) "[t]here is no dizziness;" and (2) the plaintiff "does not seem to have any memory loss her recollection of her medical history is excellent and free-flowing."  *Id.* at 928.  For his assessment, Dr. Bernstein indicated that the plaintiff had, *inter alia*, "[c]ognitive dysfunction possibly due to Topamax," "[s]evere migraine headaches," and "[d]izziness and lightheadedness."  *Id.* at 929.  As part of his treatment plan, Dr. Bernstein stated that "[f]or cognitive testing, I did do a [sic] immediate recall test with three objects which she was able to repeat with rapid-fire without hesitation, I do not feel that there is a neurologic deficit, but I am concerned as to perhaps the Topamax is causing the problem."  *Id.*  He further indicated that the plaintiff "has been under increasing stress and anxiety has a big component may [sic] be playing a large component into this situation."  *Id.*  As such, Dr. Bernstein was providing the plaintiff with the name of a neuropsychologist for her to see.  *Id.*

All of the plaintiff's medical records, including those submitted as part of her claim for STD benefits and other leaves, were submitted for a clinical consultant review by a nurse, Karen Anthony.  Aetna's Facts at ¶ 68; Pl.'s MSJ at ¶ 68; Admin. R. at 1132-41.  Nurse Anthony provided a clinical assessment, which concluded that "based on review of the medical there is a lack of compelling physical exam or diagnostic findings to endorse a physical impairment from

headaches that would preclude sustained activity."   Admin. R. at 1140.   Nurse Anthony supported her conclusion with, *inter alia*, the following observations:  (1) during the time that the plaintiff treated with a mental health provider for anxiety and depression, she did not seek "treatment for her headaches with a frequency or intensity that correlates to her ongoing complaints of pain until March 2014 at which time she presented to the emergency room for complaints of right ear pain;" (2) although a CT scan showed otomastoiitis and the ENT specialists opined that the plaintiff had a diagnosis of otitis media, the records do not show whether this is disabling as Dr. Mascellino opined that these diagnoses were not contributing to the plaintiff's headaches; (3) the records did not show that an ENT specialist had seen the plaintiff since June 2014; (4) after the plaintiff began treating with Dr. Mascellino in June 2014, the MRA, MRI of the brain, and the extensive lab work showed normal results; (5) Dr. Bernstein referenced the possibility of the plaintiff's stress contributing to her complaints of ongoing dizziness, lightheadedness, memory and concentration issues; (6) the plaintiff's most-recent office visit notes from October and November 2014, appeared to show that her headaches were improving; (7) the plaintiff's headache log from January 2015 "indicates while the [plaintiff] had daily headaches the majority of the time the severity was rated in the 1-2 range on a scale of 1-5 and only had headaches in the 3-4 range twice within the 12 days of headache logs submitted[;]" (8) there were multiple notations of anxiety and depression throughout the medical records; and (9) there were no records of the plaintiff resuming therapy with a mental health provider.  *Id.* at 1140-41.

By letter dated February 26, 2015, Aetna advised the plaintiff that it was denying her claim for LTD benefits.  Aetna's Facts at ¶ 69; Pl.'s Resp. at ¶ 69; Admin. R. at 745-47.  The letter identified the plaintiff's purportedly disabling diagnosis as migraine headaches,

acknowledged and outlined the essential duties of her sedentary occupation as a mortgage loan officer, discussed the medical information dating back to the plaintiff's claim for STD benefits, and concluded that "the medical information received to date does not support an inability to perform your occupation." Aetna's Facts at ¶ 69; Pl.'s Resp. at ¶ 69; Admin. R. at 745-47.[31] The letter also stated that "[t]here is insufficient medical evidence to endorse a functional impairment October 21, 2013 forward. Based on review of the medical there is a lack of compelling physical exam or diagnostic findings to endorse a physical impairment from headaches that would preclude sustained work activity." Admin. R. at 745-46.

In response to Aetna's denial of LTD benefits, the plaintiff submitted a "personal statement" dated March 6, 2015. Pl.'s MSJ at ¶ 83; Aetna's Resp. at 83; Admin. R. at 904-07. In this statement, the plaintiff disputed the assessment that a mortgage loan officer is a sedentary position. Admin. R. at 904-05. The plaintiff also discussed the treatment of her headaches and the progression in severity of those headaches leading up to October 21, 2013. *Id.* at 905-06. While discussing her headaches, the plaintiff stated as follows:

> Now the headaches are somewhat better whereby I am not having severe migraines everyday but other symptoms are present. I still have side effects from the Topamax and had to ask for a reduction in dosage because I was losing my hair as well as weight. I had lost 20 pounds in one year. Most people would like that but when you are only 110 to begin with, 20 pounds is quite a lot of weight.

*Id.* at 907. The plaintiff also listed various symptoms of Topamax.[32] *Id.* She further stated that she was

> still undergoing testing to be sure that the symptoms that I possess are in fact side effects and not a sign of another issue. On March 12, I will see Mary Ann Picone,

---

[31] Although the plaintiff admitted and denied in part Aetna's factual statement, the only part she identified that she was denying was whether Aetna had made "a reasonable decision." Pl.'s Resp. at ¶ 69.

[32] The plaintiff indicates in her statement that she highlighted her side effects in red. Admin. R. at 907. Unfortunately, no red highlighting appears on the statement. *Id.* It is unclear whether the plaintiff did not highlight any text or the copying of the administrative record removed the highlighting. Regardless, the missing highlighting is impertinent to the ultimate disposition of these cross-motions for summary judgment.

> a neurologist who specializes in Multiple Sclerosis. Is it possible that it was missed? Yes it is possible because my fatigue and cognitive loss are the most debilitating issues that I have now. The pain is secondary but is still as debilitating.

*Id.*

The plaintiff appealed from Aetna's decision to deny her LTD claim via a letter from her counsel dated March 16, 2015.[33] Aetna's Facts at ¶ 70; Pl.'s Resp. at ¶ 70; Admin. R. at 858. Via a letter dated April 15, 2015, from the plaintiff's counsel, the plaintiff provided Aetna with (1) office notes from her visits with Dr. Mary Ann Picone on March 12, 2015, and April 13, 2015, and (2) the results from a lumbar puncture administered on April 8, 2015, which indicated a diagnosis of multiple sclerosis. Aetna's Facts at ¶ 71; Pl.'s Resp. at ¶ 71; Pl.'s MSJ at ¶ 89; Aetna's Resp. at 89, Admin. R. at 791-802.

Dr. Picone's March 12, 2015 office visit notes described the plaintiff's chief complaints and history as follows:

> [L]ost MRI of brain from 4/14, saw Dr[.] Mascellino, most symptoms are intermittent[.]
> 50 year old right handed woman here for evaluation of chief complaint of fatigue. She has history of migraines. She has trouble concentrating, trouble getting out of bed. She used to be obsessive about her house and now she can barely get up out of bed[.] She gets migraines about two to three times monthly. She takes sulindac for her migraines. [S]he is still gettin[g] her menstrual periods. She has never lost vision in her eyes but does get right eye pain. She takes [C]ymbalta for anxiety. She has not had weakness or difficulty walking. She also has had ear pain and has seen [ENT]. She states she is [sic] of ten forgetful and forgets where she puts things.
>
> She presented with undiagnosed neurological disorder new patient. Quality: chronic. Onset: ongoing. Limitation of Activities: unable to keep up with peers. Frequency of episodes unchanged.
>
> In addition, she presented with headache. Location: in the frontal area. Quality: sharp. Onset: ongoing. Limitation of Activities: moderately limits activities. Frequency of episodes daily.

---

[33] Aetna's statement of facts indicates that Aetna received notice of the appeal on March 13, 2015, but the aforementioned letter is dated March 16, 2015. Aetna's Facts at ¶ 70; Admin. R. at 858.

Pl.'s MSJ at ¶ 88; Aetna's Resp. at ¶ 88; Admin. R. at 792.

Dr. Picone's office visit notes for the plaintiff's visit on April 13, 2015, state that "[s]he presented with fatigue.  Quality: chronic.  Onset: ongoing.  Limitation of Activities: moderately limits activities.  Frequency of episodes daily." Pl.'s MSJ at ¶ 90; Aetna's Resp. at ¶ 90; Admin. R. at 800 (emphasis omitted).  Dr. Picone described the plaintiff's neurological symptoms as "dysphagia, balance, numbness, stiffness, dizziness, pain, generalized, memory loss, headache, weakness (legs and had [sic]) and spasm."  Pl.'s MSJ at ¶ 90; Aetna's Resp. at ¶ 90; Admin. R. at 800 (emphasis omitted).  Dr. Picone also indicated that the plaintiff complained of insomnia and fatigue, and she had "anxiety but denied depression."  Pl.'s MSJ at ¶ 90; Aetna's Resp. at ¶ 90; Admin. R. at 800 (emphasis omitted).  Dr. Picone diagnosed the plaintiff with multiple sclerosis, and her notes indicate an onset date of April 13, 2015.[34]  Admin. R. at 801-02.

In examining the plaintiff's appeal from the denial of LTD benefits, Aetna had engaged the services of (1) Dr. Steven D. Graham, board certified in Psychiatry and Neurology, to perform an independent medical review "from a neurological perspective," and (2) Dr. Gitry Heydebrand, board certified in psychology.  Aetna's Facts at ¶¶ 73-74; Pl.'s Resp. at ¶¶ 73-74; Admin. R. at 769-74, 780-84.   Aetna provided Dr. Graham and Dr. Heydebrand with the plaintiff's entire claim file and they prepared reports.  Aetna's Facts at ¶¶ 73-74; Pl.'s Resp. at ¶¶ 73-74; Admin. R. at 769-74, 780-84.

Dr. Graham opined to a "reasonable degree of clinical certainty" that the plaintiff had "no neurological impairment supported in any of the medical records from 10/21/2013 through

---

[34] The plaintiff contends that "it is disingenuous for [Aetna] to imply the 'onset date' was April 13, 2015.  Rather, this was the date of the office note (compare Dr. Picone's reference to Ms. Ackaway's 'onset date' for headaches through 3/12/15)." Pl.'s Resp. at ¶ 72.  Unfortunately for the plaintiff, the only document in the record that speaks to an onset date is Dr. Picone's office visit note and it clearly states: "MULTIPLE SCLEROSIS Onset: 4/13/15."  Admin. R. at 802.  The plaintiff has not identified any other document in the administrative record containing another onset date.

05/31/2015." Admin. R. at 784. He based this conclusion "upon medical records, which do not document any specific neurological examination abnormalities, and there is no detailed explanation or discussion in any of the medical records as to why the self-reported complaints of headaches translate into ongoing complete neurological impairment." *Id.* Dr. Graham also concluded that "there is no clear neurological indication for any specific occupational restrictions or limitations. Specifically, [the plaintiff] does not require work modification such as lighting adjustments or limited computer use." *Id.* He based this conclusion "upon the absence of any specific neurological examination findings, which would directly translate into any specific neurological restrictions or limitations." *Id.*

Dr. Heydebrand, when asked to describe the plaintiff's functional impairments, if any, from October 21, 2013, through May 31, 2015, stated as follows:

> The documentation available for review indicates that the claimant complained of chronic headaches but there is no description in the medical records that specify how symptoms have been interfering with daily functioning from 10/21/13 through 5/31/15. Her AP Dr. Safer [sic] recommended short-term disability related to headaches and anxiety, but declined to support a claim for long-term disability[.] Per notes of AP Dr. Bernstein (e.g., 10/14/14), the claimant's headaches are described as "improving". The claimant's providers fairly consistently report that the claimant was complaining of problems with memory during the period in question but there was no indication of concerns regarding mental status issues in office visit notes of various providers. Further, the claimant's "personal statement" of 3/6/15, though completed with editing and typing support by her husband, indicates a fairly effective capacity for organization, presentation, and reasoning. In the absence of a neuropsychological assessment conducted by a qualified professional that included an evaluation of effort and documented cognitive dysfunction, there is no support for a conclusion of cognitive deficits or psychological/psychiatric symptoms that would cause functional impairment.

Aetna's Facts at ¶¶ 74, 75; Pl.'s Resp. at ¶¶ 74, 75; Admin. R. at 773. The doctor also opined as to any adverse side effects of any medication insofar as they would affect work activities. Admin. R. at 773. Dr. Heydebrand opined that

> while the documentation indicates that the [plaintiff] was reporting and complaining of memory loss, she did not display significant cognitive defects on basic mental status screening.  In the absence of substantiation in the form of test results conducted by a qualified neuropsychologist indicating cognitive dysfunction and specifying impact on daily functioning, no conclusions can be drawn regarding effects of medication that would interfere with work activities.

Admin. R. at 773.

Via a letter dated July 9, 2015, Aetna informed the plaintiff, through her counsel, that it upheld the denial of her claim for LTD benefits.  Pl.'s MSJ at ¶ 91; Aetna's Resp. at ¶ 91; Aetna's Facts at ¶ 76; Pl.'s Resp. at ¶ 76; Admin. R. 758-61, 763-66.  After referencing the definition of disability in the LTD Plan and Aetna's interpretation of some of the plaintiff's medical records, the letter stated as follows:

> In conclusion, [the plaintiff] reported daily chronic headaches but there are no notes detailing severity or intensity of symptoms and improvement was reported over the course of treatment though with some recurrence of headaches.  The medical records do not document any specific neurological examination abnormalities and there is no detailed explanation or discussion in any of the medical records as to why the self-reported complaints of headaches translate into ongoing complete neurological impairment.  [The plaintiff] appeared to be experiencing anxiety to some extent, though this is not detailed.  There is considerable variability regarding reports of depression.  [The plaintiff] reported memory loss but the office notes from various providers show no signs of observed memory issues during the office visit.  [The plaintiff] was not referred for neuropsychological testing until November 2014, but there does not seem to have been any follow up in this regard.  No test results from neuropsychological testing have been provided.  Of interest, the statement provided by [the plaintiff], dated March 6, 2015, and edited by her spouse, presented a long, organized and detailed argument on her behalf.  It would appear that such a presentation would be a considerable challenge to complete for an individual with significant cognitive defects.  The overall impression from the documentation is of fluctuating concerns with complaints with a lack of substantiation in the form of specific objective assessment of reported symptoms.

> Psychologically, there is no support for impairment.  Although the records indicate that [the plaintiff's] providers recommended that she undergo a neuropsychological examination, we have not been provided with those results.  In the absence of quantified data such that can be obtained by a neuropsychological assessment conducted by a qualified professional that

included an evaluation of effort and documented cognitive dysfunction, there is no support for impairment due to a mental health condition.

Neurologically, the medical evidence do [sic] not document any specific neurological examination abnormalities and there is no detailed explanation or discussion in any of the medical records as to why [the plaintiff] would be impaired due to her headaches.  Appropriate medication was prescribed to treat [the plaintiff's] headaches and the records indicate that over time, her headaches improved over the course of treatment.  [The plaintiff] was recently diagnosed with multiple sclerosis, according to the office note from Dr. Picone, dated March 12, 2015.  However, there is no evidence that [the plaintiff] would be precluded from performing the duties of her own occupation due to this condition.

Based upon our review of the submitted documentation, and the rationale detailed herein, we have determined that there remains a lack of medical evidence to support [the plaintiff's] claim for disability from October 21, 2013 through April 20, 2014 (elimination period) and from April 21, 2014 forward for the reasons stated above.

Admin. R. at 760.

## C.      Analysis

Because the court is reviewing cross-motions for summary judgment, the court will briefly summarize the parties' contentions.  In her motion for summary judgment, the plaintiff concentrates her argument on certain purported "procedural irregularities that demand a high degree of scrutiny."  Pl.'s Mem. at 13.  The plaintiff contends that "Aetna's selective, self-serving review and parsing of the medical evidence was so significant and ingrained, indeed fixed, as to be fatal to any assertion that the claim decision was reasonable and supported by the evidence of record and, causes one to reasonably doubt Aetna's neutrality as a plan administrator."  *Id.* at 13-14.

The plaintiff then identifies seven different procedural irregularities that she argues supports this court finding that Aetna committed an abuse of discretion.  *Id.* at 14-20.  Those procedural irregularities are as follows:  (1) Aetna denied the plaintiff's application for STD benefits by relying on a cold review of a hired physician and ignoring her symptoms such as

migraine headaches and fatigue that were contained in her treating physicians' office visit notes; (2) Aetna continually and unreasonably failed to consider the plaintiff's symptoms such as migraine headaches (and thereafter an aggregation of headaches), increasing fatigue, and lethargy with an increase and change of medications; (3) Aetna failed to consider or substantively address the contemporaneous office notes of any of the plaintiff's physicians from the onset of her disability to the denial of her appeal (from the initial denial of her claim for LTD benefits); (4) Aetna unreasonably failed to substantively consider the side effects of the medications the plaintiff was taking for her migraine headaches and her subsequent diagnosis of multiple sclerosis; (5) Aetna failed to engage in an "real analysis" of the plaintiff's pre-disability vocation insofar as it failed to consider her documented non-exertional limitations; instead, it simply indicated that her job was sedentary, which only could have been appropriate if she suffered from only exertional limitations; (6) Aetna failed to request that the plaintiff undergo an independent medical examination; and (7) Aetna failed to provide "good reason" when relying on the opinions of their record-reviewing physicians instead of the plaintiff's treating family physician and three neurologists. *Id.* at 14-21.

In Aetna's motion for summary judgment, it generally points out that the decisions to deny the plaintiff's claims for STD and LTD benefits were not arbitrary or capricious because they were supported by substantial evidence in the record. *See* Aetna Br. at 6 ("Aetna's Decisions Denying Short Term and Long Term Disability Benefits Were Reasonable and Supported by Sufficient Evidence in the Administrative Record." (emphasis omitted)).  With regard to the plaintiff's application for STD benefits, Aetna points out that the only evidence she submitted to support this application consisted of subjective reports of pain resulting from severe headaches. *Id.* at 7.  Aetna argues that the plaintiff's treating physicians, Dr. Bernstein and Dr.

Safar, indicated that there was no objective medical evidence to support the purported impairing symptoms or disability. *Id.* at 7-8.

As for the plaintiff's application for LTD benefits, Aetna disputes the plaintiff's assertion that it somehow acted improperly by following the terms of the LTD Plan and requiring the plaintiff to submit objective evidence to support a finding of disability. *Id.* at 8. Aetna contends that the additional medical information provided by the plaintiff supports its decision that she was not disabled as defined in the LTD Plan. *Id.* at 9. For example, Aetna characterizes the plaintiff's conduct in 2014 as "jump[ing] around from doctors depending on whether they would agree to authorize her for continued leave of absence." *Id.* at 9. Essentially, Aetna is disputing the plaintiff's assertion that she continued to seek out physicians who would assist her in resolving her symptoms, by portraying the plaintiff as an individual that moved from doctor to doctor until she heard what she wanted to hear or received the excuse to not work that she wanted to get. *Id.*

Aetna notes that Dr. Bernstein and Dr. Mascellino found that the plaintiff's headaches were under good control and she was not subject to a neurological abnormality. *Id.* Also, although Aetna recognizes that Dr. Mascellino submitted the October 15, 2014 worksheet indicating that the plaintiff was unable to work, the doctor's own office visit notes and the notes from the plaintiff's other physicians from October 2013 through October 2014 contradicted the information in this worksheet. *Id.* at 10.

As for Aetna's reliance on its hired physicians, it notes that it does not have to give special deference to the opinions of the plaintiff's treating physicians because its hired physicians based their opinions on the same records of examinations upon which the plaintiff's physicians relied. *Id.* at 10-11. Here, Aetna hired two board-certified neurologists and a

licensed psychologist to render opinions and those physicians concluded that the plaintiff did not show any neurological impairments supporting a finding of a functional impairment because of the plaintiff's headaches.  As such, Aetna contends that it did not commit an abuse of discretion in denying the plaintiff's claim for LTD benefits.

Before addressing the parties' contentions, the court notes the following:  First, as indicated above, the parties agree that the applicable standard of review in this case is the arbitrary and capricious (or abuse of discretion) standard.  *See* Pl.'s Mem. at 10; Aetna Br. at 4.  Second, "[t]he plaintiff retains the burden to prove that [he or she] is entitled to benefits, and that the plan administrator's decision was arbitrary and capricious."  *Rubin v. Amerihealth Administrators, Inc.*, No. CIV. A. 12-3719, 2013 WL 3967569, at *5 (E.D. Pa. Aug. 2, 2013) (citing *Molinaro v. UPS Health & Welfare Package*, No. CIV. A. 10-5791, 2013 WL 255042, at *3 (D.N.J. Jan. 23, 2013)); *see Chiodo v. Aetna Life Ins. Co.*, No. CIV. A. 14-2270, 2015 WL 1525049, at *8 (E.D. Pa. Apr. 6, 2015) ("Under [Aetna's] Plan, [the plaintiff] bore the burden of establishing that he met the test for disability.").  Finally, although the parties do not necessarily agree with each statement in their respective statements of undisputed material facts, those disputes relate more to the characterization of the evidence or assertions that their adversary improperly asserting argument or legal conclusions.  In other words, the parties did not actually provide conflicting views of the record.[35]  Even to the extent that any of the parties' disputes could be considered a genuine dispute over a fact, the court finds that none of the disputes involve **material** facts that would preclude the entry of summary judgment for the prevailing party in this case.[36]

---

[35] To the extent there are any conflicts, the information used to create the conflict is not part of the record.  *See* n.23, *supra*.

[36] The court has located multiple recent Third Circuit decisions in ERISA actions in which the court examined the record before the district court to see whether there were any genuine issues of material fact that should have

### 1.      The Plaintiff's Claim for STD Benefits

Unfortunately, in the plaintiff's memorandum of law in support of her motion for summary judgment and even in her reply brief in response to Aetna's motion for summary judgment, she occasionally references her arguments without distinguishing between the two claims that she has in this case, namely, Aetna's alleged wrongful denial of her applications for STD and LTD benefits.  Nonetheless, the court has endeavored to parse out those portions of the arguments that apply to each of these claims in the amended complaint recognizing that there is obviously some overlap as the arguments apply to both claims.

With respect to the plaintiff's claim for STD benefits, the plaintiff had the burden to show that she could not "perform [her] essential occupation functions, including working [her] regularly scheduled hours, for more than seven consecutive calendar days because of a pregnancy, illness, injury, organ donation, non-elective surgery or hospitalization."  Admin. R. at 542.  In addition, the STD Plan expressly provided that Aetna would deny a STD benefits claim if a claimant failed to "provide **satisfactory objective medical evidence of disability** or continuing disability or other information requested by the STD Claims Administrator." *Id.* at 544.

As indicated above, the plaintiff argues that Aetna failed to give proper consideration to her subjective complaints of chronic migraine headaches and fatigue.  Courts have determined that a plan or claims administrator commits an abuse of discretion if it requires objective medical evidence to show fatigue (or another subjective condition).  *See Heim v. Life Ins. Co. of N. Am.*,

---

precluded the district court from entering summary judgment.  *See, e.g.*, *Reed v. Citigroup Inc.*, No. 15-2094, 2016 WL 3626816, at *3 (3d Cir. July 7, 2016) (nonprecedential opinion) (concluding, in ERISA action, "that there are genuine issues of material fact and that it is not clear from the current record whether MetLife's decision was arbitrary and capricious").  Nonetheless, some judges in this district have noted that "[w]here the decision [of an ERISA-governed plan] to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Neptune v. Sun Life Assur. Co.*, No. 10-cv-2938, 2013 WL 5273785, at *6 (E.D. Pa. Sept. 16, 2013) (citations and internal quotation marks omitted).

No. 10-1567, 2012 WL 947137, at *7-9 (E.D. Pa. Mar. 21, 2012) (referencing cases and concluding that plan administrator committed abuse of discretion by requiring objective medical evidence to prove complaints of fatigue); *Elms v. Prudential Ins. Co. of Am.*, No. CIV. A. 06-5127, 2008 WL 4444269, at *14 n.21 (E.D. Pa. Oct. 2, 2008) (indicating that "plan administrators must be wary of denying claims because of a lack of objective evidence when the disabling condition on which the claimant rests her cause rests heavily on subjective evidence"). Here, however, there is no direct evidence or circumstantial evidence from which the court could infer that Aetna sought objective medical evidence from the plaintiff to prove that she was suffering from fatigue or that it decided against her because she failed to produce this type of documentation.  Additionally, to the extent that the plaintiff's headaches constitute subjective complaints, Aetna's letter in which it denied her appeal from the denial of STD benefits stated "the documentation [of chronic daily headaches] provided was not indicative of a functional impairment that would have precluded you from performing your own occupation."  Admin. R. at 1212.  Thus, Aetna was not looking for objective medical evidence from the plaintiff to establish the etiology of her illnesses; instead, it sought objective medical evidence of the impact of these symptoms or illnesses on her ability to perform her occupation functions.  *See Hoover v. Metropolitan Life Ins. Co.*, No. CIV. A. 05-4323, 2006 WL 343223, at *8 (E.D. Pa. Feb. 14, 2006) (citing cases and explaining difference between plan administrator requiring claimant to produce objective medical evidence of symptoms or diagnoses and requiring claimant to produce objective medical evidence that the illness or symptoms renders the claimant unable to work). Aetna's determination that the plaintiff failed to satisfy her burden of providing evidence in compliance with the terms of the STD Plan does not render Aetna's denial decision arbitrary and capricious.

In conjunction with the plaintiff's argument that Aetna committed an abuse of discretion by failing to properly credit her subjective complaints insofar as they were corroborated by notation in the medical records, she also argues that Aetna failed to give proper consideration to the notes and reports of her treating physicians, Dr. Bernstein and Dr. Safer, while giving too much consideration to Dr. Cohan's "cold record" assessment. These arguments also lack merit.

Although "ERISA 'does not require that plan administrators give the opinions of treating physicians special weight, courts must still consider the circumstances that surround an administrator ordering a paper review [from a non-treating physician].'" *Connelly v. Reliance Standard Life Ins. Co.*, No. CIV. A. 13-5934, 2014 WL 2452217, at *5 (E.D. Pa. June 2, 2014) (quoting *Post v. Hartford Ins. Co.,* 501 F.3d 154, 166 (3d Cir. 2007) (citation omitted) and also citing to *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831 (2003)). Additionally,

> [p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, which may include a treating physician's opinion, but a court cannot "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."

*Id.* (quoting *Nord,* 538 U.S. at 834).

In the first instance, contrary to the plaintiff's assertion, the record does not demonstrate that Dr. Cohan simply conducted a "cold record" review of documents in this case. More specifically, while Dr. Cohan undeniably did not personally examine the plaintiff and instead conducted a review of the medical documentation submitted by the plaintiff, he went beyond merely reviewing the documents. Dr. Cohan conducted peer-to-peer consultations with the plaintiff's treating physicians, Dr. Safar and Dr. Bernstein. During these conversations (at least as reported by Dr. Cohan in his report), both of the plaintiff's treating physicians provided Dr.

Cohan with confirmation of information contained in their records and additional information about their recommendations and diagnoses.

In this regard, Dr. Bernstein's office visit notes during the applicable period indicated that the plaintiff was complaining of severe frontal headaches over the past two to three months (due to stress at home and work).  In his office visit notes and APS, Dr. Bernstein did not indicate any relevant limitations on the plaintiff's ability to work (even indicating "N/A" in most of the applicable sections), and he indicated that she had no impaired cognitive function or inability to concentrate.  Dr. Bernstein did not indicate any objective findings regarding the headaches.[37]

As for Dr. Safar, his office visit notes and APS also included a diagnosis of chronic daily headaches based upon the plaintiff's complaints, but he also noted that there were no complications and no objective findings.  He indicated that the plaintiff would treat with Topamax to hopefully relieve the pain from the headaches.  His APS stated that the plaintiff's headaches had improved.  Dr. Safar's APS did not preclude the plaintiff from working, but he did include some restrictions and limitations (such as prolonged computer work, stressful situations, and noisy environments).

There is no indication in Dr. Cohan's report that he disagreed with Dr. Safar and Dr. Bernstein's diagnoses.  As already stated, Dr. Cohan spoke to both physicians.  Dr. Bernstein did not tell Dr. Cohan that he had excused the plaintiff from work because he determined that she was functionally incapable of working; instead, Dr. Bernstein indicated that at the plaintiff's request, he excused her from work so she could "complete further diagnostic testing and neurologic consultation."  Admin. R. at 1228.  Dr. Safar noted that the plaintiff had requested

---

[37] The plaintiff does not mention Dr. Sreepada's report as part of her argument, but the court notes that Dr. Sreepada reviewed a CT scan of the sinus and MRI of the brain, which showed no significant intracranial or sinonasal pathology.

that he allow her to be out of work for a period of five or six months, and he refused to support her request. Instead, Dr. Safar believed that the plaintiff required only a temporary absence from work while she underwent her initial treatment and adjusted to the new medication. Dr. Safar also informed Dr. Cohan that the plaintiff was tolerating the Topamax well and it reduced the frequency and severity of her headaches.

After reviewing the medical documentation (including the plaintiff's "job description") and consulting with Dr. Bernstein and Dr. Safar, Dr. Cohan disagreed that the plaintiff could not perform work at a sedentary or light physical demand level. Dr. Cohan referenced the lack of documentation in the record of, *inter alia*, (1) the plaintiff's headaches being associated with nausea or vomiting, and (2) the plaintiff not presenting on an urgent or frequent basis for analgesics. Simply because Aetna did not chose to follow Dr. Safar's opinion (or Dr. Bernstein to extent there was an opinion), resulting in an unfavorable decision for the plaintiff, does not mean that Aetna acted arbitrarily and capriciously. *See, e.g., Johnson v. Hartford Life & Acc. Ins. Co.*, No. CIV. A. 03-3336, 2004 WL 1858070, at *28 (E.D. Pa. Aug. 19, 2004) ("That Hartford had to resolve competing medical records and opinions, and did so in a manner unfavorable to [the plaintiff], does not constitute an abuse of discretion.").

Two additional points about Dr. Cohan's report are worth mentioning. First, the plaintiff asserts that the opinion in *Charles v. UPS National Long Term Disability Plan*, 145 F. Supp. 3d 382 (E.D. Pa. 2015) supports her assertion that Aetna's reliance on Dr. Cohan and the insistence that the plaintiff produce objective medical evidence was an abuse of discretion. *See* Pl.'s Mem. at 15; *see also* Plaintiff Anna Ackaway's Reply Br. in Resp. to Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Pl.'s Resp.") at 2-3, Doc. No. 38-1. The plaintiff contends that in *Charles*, "Aetna was taken to task for arbitrarily relying on the same Dr. Cohan in denying the

plaintiff's disability benefits who was taking anti-seizure medication [(Lacmital)]." Pl.'s Mem. at

15.  The plaintiff then recites the following portion of the opinion that she believes best supports

her argument that Aetna wrongfully relied upon Dr. Cohan in this case:

> The defendants further argue that there was no *clinical* or "objective" evidence to
> support the restrictions placed on the plaintiff.  Both Dr. Cohan and Dr. Root
> made this point in determining that the plaintiff was not disabled.  Though it's not
> clear what type of clinical evidence Aetna thought was missing, Aetna implicitly
> argues that the plaintiff's self-reported feelings of fatigue and his doctor's
> diagnosis that Lacmital caused this sedation were not enough to show disability.
> Aetna's expectation that the plaintiff should undergo some additional "clinical test
> to prove that he is, in fact, experiencing fatigue from his medication is arbitrary
> and capricious.  *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 443 (3d Cir.
> 1997) (finding that requiring clinical evidence to prove plaintiff had chronic
> fatigue syndrome, a condition with no "dip stick" lab test was arbitrary and
> capricious).

*Id.* (quoting *Charles*, 145 F. Supp. 3d at 401 (internal footnotes omitted)).

This particular portion of the analysis in *Charles* is distinguishable from the facts of this

case for the following reasons.  First, as evidenced by the *Charles* court's analysis, *Charles*

involved a plan administrator requiring objective medical evidence to support a diagnosis or

symptom, which this court recognizes is improper and can constitute an abuse of discretion.  *See*

*Charles*, 145 F. Supp. 3d at 401 (criticizing Aetna's requirement that the plaintiff undergo a

medical test "to prove that he is, in fact, experiencing fatigue").  As explained above, the record

does not reflect that Aetna attempted to do that here.  Second, in *Charles*, the plaintiff's treating

physician actually linked the plaintiff's symptoms relating to sedation and fatigue to the

medication he was taking.  Because of this, the district court was critical as to what type of

objective medical evidence the plaintiff could otherwise submit to the defendant to show that he

was experiencing fatigue.  Here, although the plaintiff indicated in her documentation submitted

for her appeal from the STD benefits denial that she believed that the Topamax was having

adverse effects, such as fatigue, there is no documentation in the record linking the fatigue to

Topamax.  Instead, Dr. Safar told Dr. Cohan that the plaintiff was tolerating the Topamax well and he had even increased the dosage.  As the party with the burden of proof, it was incumbent on the plaintiff (and not Aetna) to provide objective medical evidence to support of claim of an inability to work.  *See, e.g.*, *Pinto*, 214 F.3d 377, 394 n.8 (3d Cir. 2000) (explaining that the court was not holding that the plan administrator had a duty to conduct an investigation), *overruled on other grounds by, Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008).

The second point worth mentioning is that the plaintiff argues that somehow Dr. Cohan (and consequently, Aetna) failed to review her job description.  Although Dr. Cohan did not attach a copy of the plaintiff's job description to his report, he indicated that a "Job description" was one of the records he reviewed before issuing his report.  He also listed the plaintiff's job as a mortgage loan officer.  As Aetna's asserts, Dr. Cohan not providing a detailed analysis of her job as a mortgage loan officer does not necessitate a finding that Aetna committed an abuse of discretion.  *See Boby v. PNC Bank Corp.*, No. CIV. A. 11-848, 2012 WL 3886916, at *17 (W.D. Pa. Sept. 6, 2012) ("In sum, there is no dispute that Plaintiff's job description was provided [for the doctors] to consider in reviewing Plaintiff's claim of total disability, and both reviewing physicians referred to Plaintiff's specific position in their reports. . . . [T]he failure of [the reviewing doctors] to provide a detailed analysis of Plaintiff's diagnoses and their effect on the essential duties of his position with [his employer] does not warrant a finding that the decision to deny LTD benefits to Plaintiff was arbitrary and capricious.").

## 2.     The Plaintiff's Claim for LTD Benefits

As indicated above, under the LTD Plan, LTD benefits are payable only after a claimant meets the test of disability and satisfies the 180-day elimination period.  The LTD Plan's test of disability is whether the claimant, in the 18 months from the date you first become disabled,

"cannot perform the material duties of [the claimant's] own occupation solely because of an illness, injury or disabling pregnancy-related condition."  Admin. R. at 1660 (emphasis omitted). The SPD defines "own occupation" as "the occupation that you are routinely performing when your period of disability begins.  Your occupation will be viewed as it is normally performed, without regard to your specific reporting relationship, in the national economy instead of how it is performed for your specific employer at your location or work site."  *Id.* at 555, 1675.  The LTD Plan also defines "material duties" as those that "are normally required for the performance of your own occupation; and cannot be reasonably[] omitted or modified.  However, to be at work in excess of 40 hours per week is not a material duty."  Admin. R. at 1675 (emphasis omitted).  The SPD and Booklet-Certificate also inform a claimant of the occurrences by which the claimant will no longer be considered disabled or eligible for LTD benefits, including (1) on the date Aetna determines that the participant no longer meets the LTD test of disability, or (2) the date a claimant fails to provide proof that he or she meets the LTD test of disability.  Admin. R. at 1661, 552.

The plaintiff raises additional claims of procedural irregularities that particularly apply to her claim for LTD benefits.  Because reviewing the plaintiff's arguments of procedural irregularities with respect to her LTD claim encompasses essentially almost all of Aetna's corresponding claims in support of its motion for summary judgment, the court will address each of the purported irregularities in turn.

The first procedural irregularity the plaintiff identifies is Aetna's purported failure to properly consider her presentation of symptoms such as "migraine headaches and thereafter an aggregation of headaches, increasing fatigue and lethargy with an increase and changing of medications."  Pl.'s Mem. at 15 (emphasis omitted).  More specifically, the plaintiff contends

that the submitted medical documentation from October 2013 until April 2015, "illustrate [her] concerted efforts to get treatment and . . . get better." *Id.* at 16. She argues that it is essentially normal that her "chronic medical condition" did not "follow a straight trajectory" insofar as her reported ailments (and the severity of those ailments) changed over time. *Id.* She also points out that on some visits her medication was working to lessen the frequency or severity of her headaches and on other occasions, she would inform her doctors that the medication (or the adverse effects of multiple sclerosis) was causing her "debilitating fatigue." *Id.* As such, she contends that "[a]ny reasonable assessment of [her] presentation of symptoms should illustrate that there was a very real and very debilitating reason why she could no longer perform her $100,000+ job as a Loan Officer." *Id.*

Aetna responds to the plaintiff's arguments by attempting to distinguish between the physicians merely reporting the plaintiff's statements in an office visit note and the physicians actually finding that the plaintiff had a disability that impaired her ability to work. Response of Def. Aetna Life Ins. Co. in Opp. to Pl.'s Mot. for Summ. J. ("Aetna's Resp.") at 10-11, Doc. No. 40. Aetna asserts that it, as a plan administrator, does not act arbitrarily and capriciously when it determines that a plaintiff fails to provide sufficient objective evidence when the evidence submitted is essentially doctors' reports recording the plaintiff's complaints. *Id.* at 11. Aetna further points out that the plaintiff has also mischaracterized the record because the record demonstrates that it did consider her subjective complaints, but determined that the complaints did not preclude the plaintiff from working. *Id.*

The court has already discussed the difference between a plan administrator seeking objective medical documentation to determine the etiology of a claimant's symptom or diagnosis and such an administrator seeking objective medical evidence to show that she was functionally

impaired from performing her own occupation.  Although the plaintiff contends that Aetna's independent physicians "ignored [her] ongoing symptomology," *see* Pl.'s Mem. at 16, a review of those physicians' reports shows that they did not "ignore" the symptomology; rather, they determined that the medical records did not show that the symptomology resulted in a functional impairment.  In addition, a review of Aetna's letter denying the plaintiff's appeal from the initial denial of her claim for LTD benefits demonstrates that Aetna in fact considered the plaintiff's subjective complaints and symptoms and determined that they did not meet the definition of disability to qualify for LTD benefits.  "[C]ourts within the Third Circuit have held that it is not an abuse of discretion to require objective evidence that a condition . . . is sufficiently disabling to warrant an award of LTD benefits." *Balas v. PNC Fin. Servs. Grp., Inc.*, No. 10-249, 2012 WL 681711, at *10 (W.D. Pa. Feb. 29, 2012) (citing cases); *see also Maniatty v. Unum Provident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) (finding that ERISA plan's requirement that claimant provide proof of a continued disability "connotes objectivity[;] thus,] it is hardly unreasonable for the administrator to require an objective component to such proof"). Aetna determined that the plaintiff failed to meet her burden under the terms of the LTD Plan insofar as she failed to provide sufficient medical documentation that she was unable to perform the material duties of her own occupation.  This determination was not an abuse of discretion. *See, e.g.*, *Nichols v. Verizon Commc'ns*, 78 F. App'x 209, 212 (3d Cir. 2003) (nonprecedential opinion) (affirming district court's grant of summary judgment in ERISA denial of benefits case because "[t]he record reveals that the denial of [the plaintiff's] claim was based on any number of factors, including the lack of objective tests demonstrating the existence of her symptoms").

For the second alleged procedural irregularity, the plaintiff asserts that Aetna "willfully ignor[ed]" any contemporaneous office visit notes from her physicians from October 2013

forward.  Pl.'s Mem. at 17.  Unfortunately, other than referencing the fact that the plaintiff saw numerous physicians that the court identified earlier in this opinion, the plaintiff does not elaborate on this particular argument.  *See id.*  The court recognizes that failing or neglecting to address particularly relevant portions of a treating physician's findings is a factor in determining whether a decision is arbitrary and capricious.  *See Branca v. Liberty Life Assurance Co.*, Civ. A. No. 13-740, 2014 WL 1340604, at *10 (E.D. Pa. Apr. 3, 2014) (describing plan administrator's neglect in addressing "key portions" of the treating physicians' findings was a factor to consider in whether the plan administrator acted in an arbitrary and capricious manner).  Between Aetna's initial denial letter and the July 9, 2015 letter affirming the denial, it referenced numerous portions of the medical documentation submitted by the plaintiff.  The plaintiff has not specified the portions of her treating physician notes that Aetna allegedly failed to consider, and it is not this court's obligation to search through her various submissions to attempt to supplement this portion of the argument in her supporting brief.  Nonetheless, even if the plaintiff had made such a showing, it would not compel the conclusion that Aetna acted arbitrarily and capriciously.  *Id.* at *12 (stating that plan administrator's "failure to give full consideration to the findings of Plaintiff's treating physicians is not dispositive of the question of whether [the plan administrator's decision] was 'arbitrary and capricious,' but rather is only one factor to consider among 'the totality of [the insurer's] actions.'" (quoting *Sanderson v. Continental Cas. Corp.*, 279 F. Supp. 2d 466, 477 (D. Del. 2003) (final alteration in original)).

The plaintiff's third alleged procedural irregularity is her contention that Aetna failed to consider the side effects of the medications that she was taking for her migraine headaches and subsequent diagnosis of multiple sclerosis.  Pl.'s Mem. at 17-18.  She points out that from October 2013 forward, she "consistently and continually complained she was suffering from

debilitating fatigue." *Id.* at 18.  The plaintiff again invokes *Charles* as supporting the conclusion that Aetna's refusal to consider the side effects of medication constitutes an abuse of discretion. *Id.* at 18 (quoting *Charles*, 145 F. Supp. 3d 382, 401 (E.D. Pa. 2015)).  The court finds this argument unpersuasive.

In the first instance, Aetna considered the side effects of the medication the plaintiff was taking before it ultimately denied her claim for LTD benefits.  In particular, Aetna asked Dr. Heydebrand to advise it of "any adverse side effects to medication that would interfere with work activities."  Admin. R. at 773 (emphasis omitted).  Dr. Heydebrand noted that taking Topamax could result in issues with memory and concentration if taken in higher doses.  *Id.*  Dr. Heydebrand also noted that on multiple occasions the plaintiff expressed her belief that Topamax was causing her to have memory and concentration issues and extreme fatigue.  *Id.*  He also pointed out Dr. Bernstein's office visit note where he indicated a concern that Topamax might be causing memory loss, so he was going to refer the plaintiff for neurological testing that appears to have not been done.[38]  *Id.*  Dr. Heydebrand also pointed out that Dr. Bernstein had conducted the 3-item word recall test that the plaintiff had no issue completing.  *Id.*  Dr. Heydebrand concluded that even though the plaintiff was complaining and reporting memory loss, those purported cognitive defects did not show up on "basic mental status screening." *Id.*  Thus, without test results from a qualified neuropsychologist "indicating cognitive dysfunction and specifying impact on daily functioning," he could not conclude that Topamax would interfere with work activities.  *Id.*

This report from Dr. Heydebrand, in itself, distinguishes this case from *Charles* because it does not appear that any discussion (other than the court's research and discussion) of side

---

[38] Dr. Bernstein also indicated that the plaintiff "has been under increasing stress and anxiety has a big component may [sic] be playing a large component into this situation."  Admin. R. at 929.

effects occurred in that case.  *Charles* is also distinguishable because a doctor in that case had actually opined that the plaintiff's medication caused fatigue or sedation.  Here, although Dr. Bernstein thought that Topamax could be causing issues with the plaintiff's memory (he did not mention fatigue), he did not conclude that Topamax was causing problems with her memory. Instead, he wanted to have the plaintiff examined to see if there could be a relation, but he also noted that the plaintiff's increased stress and anxiety could be a "large component" of her issues. Thus, the only connection between Topamax and the plaintiff's complaints of fatigue and memory loss is the plaintiff's continually-asserted belief that they were related.  The plaintiff's belief is clearly not the type of objective medical evidence that Aetna requires to substantiate a claim under the LTD Plan and Aetna could not have committed an abuse of discretion for failing to consider the plaintiff's self-diagnosis.[39]

Regarding her fourth claim of a procedural irregularity, the plaintiff claims that Aetna failed to properly consider her pre-disability vocation as a loan processing officer because Aetna's "job description" did not match her job description as noted in her personal statement. *See* Pl.'s Mem. at 19 (citing Admin. R. at 745, 904).  The plaintiff also asserts that Aetna should have considered her non-exertional limitations rather than simply reviewing her exertional limitations and finding that she was capable of sedentary work.  *Id.*

Aetna responds to these arguments by pointing out that none of her physicians identified a cognitive impairment that would have precluded her from performing in her own occupation as a mortgage loan officer.  Aetna's Resp. at 9.  Aetna further states that the record shows that it did not ignore the material duties of a mortgage loan officer.  *Id.*  Aetna indicates that it had reviewed both the plaintiff's job description and Aetna's job description and those documents

---

[39] Recognizing that the court in *Charles* reviewed the side effects for Lacmital from the Food and Drug Administration's website, this court notes that it is the plaintiff's burden to place sufficient evidence in the record to support her disability claims.  It is not Aetna's burden to attempt to locate evidence to support her claims.

were provided to the independent physicians for their consideration.  *Id.*  Aetna also argues that the plaintiff has not established that a plan administrator's job description could serve as a procedural irregularity.  *Id.*

Although the plaintiff might disagree with the breadth of Aetna's job description, it describes non-exertional aspects of her job while also characterizing it as sedentary work.  Aetna provided this job description to its peer review doctors and considered it in analyzing whether the plaintiff met the "own occupation" test for disability under the LTD Plan.  The court finds that the plaintiff has not demonstrated that Aetna acted arbitrarily and capriciously in considering this job description as part of its determination of the plaintiff's disability claims.

The plaintiff's fifth purported procedural anomaly is that Aetna failed to require her to undergo an independent medical evaluation ("IME") even though it acknowledges that "there was no requirement for Aetna to conduct an IME of [her]."  Pl.'s Mem. at 19, 20.  Regarding this alleged failure to order an IME of the plaintiff, "numerous courts in [the Third C]ircuit have held that there is no legal requirement for a plan administrator to demand an independent medical examination as part of its review of a claim for disability benefits under an ERISA-governed plan, even if the plan permits it to do so."  *Sollon v. Ohio Cas. Ins. Co.*, 396 F. Supp. 2d 560, 586 (W.D. Pa. 2005) (discussing cases).  Despite this lack of a legal requirement, other courts have concluded that "a decision to forego an IME and conduct only a paper review, while not rendering a denial of benefits arbitrary *per se*, is another factor to consider in the Court's overall assessment of the reasonableness of the administrator's decision-making process."  *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546, 563 (W.D. Pa. 2009).

Here, the failure to obtain an IME is not a factor leading to a possible determination that Aetna's denial of LTD benefits in this case was arbitrary and capricious.  In this regard, the

particular issues complained of by the plaintiff are "amenable for consideration by means of a file review."  *See Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 49 (W.D. Pa. 2011) (stating that "the failure to procure [an IME] may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review" (citations omitted)).  It does not appear from the record that Aetna disagreed with or disputed any of the diagnoses from the plaintiff's treating physicians; instead, Aetna came to a conclusion that this evidence did not meet the definition of a disability under the LTD Plan.  Therefore, the court will not consider Aetna's discretionary decision not to order an IME as a factor that would weigh in favor of finding that it acted in arbitrarily and capriciously.[40]

The plaintiff's final procedural anomaly is her claim that Aetna wrongfully relied on the independent peer review physicians and ignored her treating physicians.  Pl.'s Mem. at 20. Aetna responds by asserting that it "reasonably relied on the opinions rendered by the independent physicians who conducted reviews of all of Plaintiff's medical records and related claim information."  Aetna's Resp. at 16.

If "the insured's treating physician's disability opinion is unequivocal and based on a long-term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits."  *Harper v. Aetna Life Ins. Co.*, No. CIV. A. No. 10-1459, 2011 WL 1196860, at *10 (citing *Kaufmann v. Metropolitan Life Ins. Co.*, 658 F. Supp. 2d 643, 650 (E.D. Pa. 2009)).  Nevertheless, "it is [proper] to rely on the opinions of non-examining physicians who had before them the entire record of medical evidence, more evidence than was available to any one doctor who saw plaintiff previously."  *Etkin v. Merk & Co., Inc.*, No. CIV. A. 00-5467,

---

[40] Even if the court were to find that Aetna should have ordered an IME, this factor would only weigh slightly toward a finding that Aetna acted arbitrarily and capriciously in denying LTD benefits.

2001 1346368, at *6 (E.D. Pa. Oct. 30, 2001) (citation omitted).   Thus, a claims or plan administrator does not commit an abuse of discretion by relying on a medical record review. *Neptune v. Sun Life Assur. Co. of Canada*, No. 10-cv-2938, 2013 WL 5273785, at *12 (E.D. Pa. Sept. 16, 2013).   Also, in situations where the administrator hires physicians or consultants who essentially do not dispute the diagnosis of the treating physicians but only dispute whether the plaintiff has established a disability, the plan or claims administrator may adopt the decision of the consultants.     *Burk v. Broadspire Serv.*, 342 F. App'x 732, 737 (3d Cir. 2008) (nonprecedential opinion).

The court finds Aetna's argument persuasive that only Aetna's independent physicians had access to all of the documents in this case, whereas the record does not reflect that the plaintiff's five treating physicians had access to all of the records.   Although the plaintiff discusses her path as if it were typical to move around to multiple physicians like she did in the hope of expeditiously resolving her medical issues, it is the timing of those moves that places more value in doctors reviewing the record.   In this regard (and as noted by Aetna), Dr. Safar issued the plaintiff a note to return to work on January 20, 2014 (following up on his (Dr. Safar's) belief stated in December that the plaintiff would not need five or six months' leave from work).   The plaintiff then went and received additional excuses for work from Dr. Karpinski-Failla.   After a short while, Dr. Karpinski-Failla informed the plaintiff that if she wanted any additional work excuses, she would have to ask her neurologist or psychiatrist.

The plaintiff later received an APS from Dr. Mascellino in October 2014.   The APS indicated that the plaintiff was suffering from chronic daily headaches.   Although the plaintiff was able to, *inter alia*, work with others, give supervision, and work cooperatively with others in a group setting, Dr. Mascellino stated she had no ability to work.   Dr. Mascellino further

indicated that she had prescribed a restriction on the plaintiff's work activities since June 14, 2014, and the restrictions or limitations would remain in effect for an undetermined period. *Id.* These restrictions and limitations are also referenced in the Capabilities and Limitations Worksheet, which indicated that the plaintiff had "severe headaches, dizziness, and ear pain [and] balance problems." Admin. R. at 1085. Dr. Mascellio stated that the plaintiff's cognitive functioning was normal and otherwise unremarkable. *Id.* at 1088.

Overall, the medical records of the plaintiff's treating physicians do not provide information on clinical findings or even extensive discussion of the plaintiff's medical condition. Even though Dr. Picone diagnosed the plaintiff with multiple sclerosis with an onset date in April 2015, Dr. Picone does not opine that the plaintiff is disabled and unable to work and she does not otherwise place any limitations on the plaintiff due to this diagnosis. With this limited record of medical evidence showing an inability of the plaintiff to perform her own occupation, the court finds that it was not an abuse of discretion for Aetna to rely on the independent physicians in rendering a decision on the plaintiff's claim for LTD benefits.

Although the plaintiff does not identify any other procedural anomalies, she generally argues that this court must find that there are no genuine issues of material fact as to whether Aetna acted arbitrarily and capriciously in denying her claim for LTD benefits and the court should grant summary judgment in her favor. Pl.'s Mem. at 21. She asserts that this case is "shockingly similar" to *Charles*. *Id.* This court disagrees.

Unlike the plaintiff in *Charles,* the plaintiff here had not been treating with any physician (at least according to the administrative record) for an extensive period of time. Instead, she saw numerous physicians over relatively short periods of time. It does not appear that any of the physicians were able to see all the medical records that Aetna's independent physicians

61

considered as part of their opinions.   Additionally, the *Charles* court found numerous other issues with Aetna's handling of the LTD claim that are not present here and led to a finding that Aetna acted arbitrarily and capriciously.   For example, the court noted that Aetna did not appear to consider any of the additional information that the plaintiff submitted to it as part of his appeal.   145 F. Supp. 2d at 404.   The court mentioned a letter from the plaintiff's primary care physician that included a part-time work restriction and included a detailed explanation to support the restriction.   *Id.*   As already discussed *ad nauseam*, to the extent that the plaintiff's doctors placed restrictions on her ability to work or otherwise indicated that she should not work, they provided little or no explanation for these restrictions and there is simply no objective medical findings to support the restrictions or directives that the plaintiff not work in her own occupation.   The only objective medical finding that could have possibly led to work-related issues, the plaintiff's diagnosis of multiple sclerosis, has not been the subject of a report linking it to a restriction on the plaintiff's ability to perform her own occupation.

In addition, the *Charles* court noted that Aetna should have requested an IME (despite not being obliged to do so) because its own physician reports conflicted with each other and it did not take any steps to resolve the conflict or even introduce the additional information received into any analysis.   *Id.* at 404-05.   Here, while there is a possible conflict between the plaintiffs' treating physicians (to the extent that any of them have reached any conclusions that equate to an opinion that the plaintiff is disabled under the LTD Plan) and Aetna's independent physicians, Aetna correctly notes that it did not have to obtain an IME and, unlike the situation presented in *Charles*, this court does not find that it was an abuse of discretion not to arrange for an IME.

In conclusion, the court has reviewed all of the plaintiff's asserted procedural anomalies and does not find that any of them weigh in favor of finding that Aetna acted arbitrarily and capriciously in denying her applications for STD or LTD benefits.  Accordingly, the court will deny the plaintiff's motion for summary judgment.

### 3.  Aetna's Motion for Summary Judgment

In essence, Aetna's motion for summary judgment is the converse of the plaintiff's motion insofar as Aetna claims that the court should grant summary judgment in its favor because there are no genuine issues of material fact and it did not act arbitrarily and capriciously in denying the plaintiff's claims for STD and LTD benefits as a matter of law.  Although the court agrees with Aetna and would grant summary judgment in its favor on that basis, the court adds another ground for concluding that Aetna did not commit an abuse of discretion in denying the plaintiff's claim for LTD benefits.

In Aetna's letter denying the plaintiff's appeal from the initial denial of her application for LTD benefits, Aetna concluded that there was "a lack of medical evidence to support your . . . claim for disability from October 21, 2013 through April 20, 2014 (elimination period)." Admin. R. at 760.  In this regard, the plaintiff had the burden to establish that she was continuously disabled, *i.e.* unable to perform the material duties of her own occupation, during this elimination period.  The medical documentation shows that on January 16, 2014, Dr. Safar drafted a prescription that would have the plaintiff resuming work on January 20, 2014.  Admin. R. at 1014.  This intent is also reflected in Dr. Safar's office visit note for January 16, 2014, wherein he states "[r]esume work as of 1/20/14."  *Id.* at 1013.  This note would appear to coincide with Dr. Safar's peer-to-peer consultation with Dr. Cohan wherein he believed that the plaintiff needed only a temporary period to adjust to her medications and receive treatment.  In

addition, and as mentioned earlier in this opinion, even though there are some other references to the plaintiff receiving doctors' notes to be excused from work or that the plaintiff should not work, the documentation with those notations do not provide any details as to why the plaintiff was precluded from work other than merely reciting her diagnoses.

Since the LTD Plan requires a claimant to be continually disabled during the 180-day elimination period and the plaintiff has not shown that she was continually disabled during that period, Aetna did not commit an abuse of discretion in denying her claim for LTD benefits on that basis. As there are no genuine issues of material fact on this issue, the court finds that Aetna is entitled to judgment as a matter of law on this basis as well. *See Cini v. Paul Revere Life Ins. Co.*, 50 F. Supp. 2d 419 (E.D. Pa. 1999) (granting motion for summary judgment filed by plan administrator because evidence of record demonstrated that there were no genuine issues of fact and it did not act arbitrarily and capriciously in concluding that the plaintiff was not entitled to long term disability benefits because he failed to show that he was totally disabled during the 90-day elimination period).

### III.    CONCLUSION

The court's review of the administrative record in this case shows that there are no genuine issues of material fact that would preclude the entry of summary judgment in this case. More specifically, there are no genuine issues of material fact that would preclude the court from determining that the plaintiff has not met her burden to establish that Aetna's denial of STD and LTD benefits under their respective plans was arbitrary and capricious. Under the arbitrary and capricious standard of review, the court cannot substitute its own judgment for Aetna in determining the plaintiff's eligibility for STD and LTD benefits under their respective plans. The court does not find that Aetna's benefit denials were without reason, unsupported by

substantial evidence or erroneous as a matter of law.   Accordingly, the court will deny the plaintiff's motion for summary judgment and grant the defendants' motion for summary judgment.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.